Julia SAMANIEGO, Appellant,

v.

CITY OF KODIAK, Kodiak Police Department, Sergeant William D. Marsh, and Officer Milton Bohac, Appellees.

No. S–8189.

Supreme Court of Alaska.

May 19, 2000.

Les S. Gara and Jeffrey A. Friedman, Friedman, Rubin and White, Anchorage, for Appellant.

Frank S. Koziol, Law Office of Frank S. Koziol, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

### OPINION

COMPTON, Justice.

## I. INTRODUCTION

Julia Samaniego sued the City of Kodiak and two of its police officers. She alleged that the officers had used excessive force in arresting her, so that they were directly liable for common-law assault. She also argued that Kodiak was vicariously liable under *respondeat superior*. The superior court concluded that the officers had qualified immunity and so granted summary judgment to them and Kodiak.

The superior court adopted a qualified-immunity rule which emphasized the officers' subjective beliefs. We reverse the court's determination of the applicable law and remand for the court to apply a different standard. We announce an objective standard based on the privilege to use force in making arrests, which is codified in AS 11.81.370 and AS 12.25.070, as well as the case law interpreting our qualified-immunity statute.

Additionally, facts material to whether the officers' conduct was privileged are sharply disputed. The court's memorandum explaining its summary judgment—for which it did not enumerate findings of fact—improperly made several factual assertions that disfavor the nonmoving party, Samaniego, and contradict sworn testimony on material, genuinely disputed issues of fact. Therefore we reverse the summary judgment and remand for trial.

## II. FACTS AND PROCEEDINGS

We recount Samaniego's version of the facts and disregard allegations by the defendants that contradict sworn statements by her and her daughter. It must be borne in mind, though, that when we analyze the issue of reasonableness of the use of force, we focus on the *officers'* perspectives and perceptions, as it is what reasonable officers *in their position* could have thought that is dispositive of this issue.

### A. The Arrest

Kodiak Police Officer Milton Bohac pulled over a car with a noisy muffler. When he said over a police radio that the driver had a California license and was named José Muñoz, two Immigration and Naturalization Service (INS) agents, Catherine Malapanes and Stephanie Conway, decided to go investigate whether Muñoz and his three passengers had documentation to prove that they were legally in the United States. Two of them apparently lacked such documentation. Agent Malapanes proceeded to arrest one of them. She handcuffed him and took him to Officer Bohac's car.

While Agent Conway was in the process of arresting the second person who also apparently lacked proper documentation, Samaniego stopped her car across the street. She was driving her four children—Martha (age fifteen), Korina (age fourteen), Freddy (age eleven), and Veronica (age four)—and her friend, Lupé Crist. Samaniego was forty-one years old, five feet two inches tall, and weighed about 170 pounds.

Samaniego called to one of the arrestees in Spanish, and he replied in Spanish. The record does not suggest that Officer Bohac speaks Spanish. Agent Conway finished handcuffing the second arrestee and put him in Officer Bohac's car, while Agent Malapanes crossed the street and asked Samaniego where she was from and whether she had ID. Samaniego replied that she was from Mexico, and that she did not have her permanent resident card or other ID with her. Apparently, Samaniego had left this documentation at home.

Kodiak Police Sergeant William Marsh pulled up in his car, and Officer Bohac directed him across the street. As Sergeant Marsh approached, Samaniego pointed at him and said, "You know who I am," and Marsh recalled that he did and said that she looked vaguely familiar. Agent Malapanes then told Sergeant Marsh that Samaniego had said that she had no ID and asked him to intervene in questioning her. Sergeant Marsh asked Samaniego if she had any ID, she replied that she did not; he asked the passengers if any of them did, they said that they did not, and he said, "I'm going to take you all to jail 'til you can identify yourselves."

Sergeant Marsh then told Samaniego, "Okay, get out of the car. Turn off the car and get out or I'm going to do it for you." The car was parked almost in the roadway. Samaniego said, "OK." She then reached for the gear shift. Sergeant Marsh grabbed her arm, turned off the ignition, opened the door, and pulled her out. He led her behind the car, while the INS agents continued investigating its occupants. Agent Conway questioned the Samaniego children, who were in the back seat, and then joined Agent Malapanes in questioning Mrs. Crist, who had left the car.

Sergeant Marsh, meanwhile, told Samaniego that she didn't have to worry about not having her driver's license and "just need[ed] to cooperate with the INS agents." She told him that she had no problem with the police, but that she did have a problem with the INS, who harass her whenever she comes to town. She was annoyed but, as Sergeant Marsh concedes, calm.

At this point, fifteen-year-old Martha Samaniego got out of the back seat and walked past the back of the car, passing Sergeant Marsh on his left. Her mother asked her in English where she was going; she replied that she was going to get the papers. Sergeant Marsh turned and grabbed Martha's left arm, spinning her to her right and causing her to stumble, and said that she wasn't going anywhere and should get back into the car until the INS was done talking to her. Samaniego then stepped between her daughter and Sergeant Marsh, extending her arms to her sides to keep Martha behind her and repeatedly telling Marsh not to touch Martha. Samaniego did not touch Sergeant Marsh in so doing. He then told Samaniego, "you're under arrest" and tried to grab her wrist; she flicked her wrist or otherwise pulled away from his grasp at least twice, saying, "no, leave me alone." He eventually grabbed her left hand, pulled it behind her, and handcuffed it.

The rapid sequence of events that followed is not fully clear.

Holding Samaniego's handcuffed left arm behind her, Sergeant Marsh began walking her, or attempting to walk her, to the back of the car. Samaniego's shirt had ridden up her torso; Martha tried to pull it down but one of the INS agents grabbed her and held her arms behind her. As Sergeant Marsh walked Samaniego to the back of the car, her right arm was "flying around"; she may have been trying to pull down her shirt, Martha later explained. Samaniego did not actively resist having her right hand cuffed, though she did not facilitate its cuffing by putting it behind her at that point.

As he walked Samaniego to the back of the car, Sergeant Marsh twice used a hand-held, 50,000–volt stun gun on the base of her neck, inflicting pain. Though she struggled in response to the pain, she did not try to hit or kick Sergeant Marsh, nor did she balk at moving where he directed her.

Sergeant Marsh then threw Samaniego against the trunk of the car; she tried to use her right hand to keep her face from hitting the car, but her face struck the trunk anyway. Sergeant Marsh soon thereafter pressed her head down and used the stun

gun on her neck at least once more, possibly twice. Samaniego did not clearly specify when each use of the stun gun occurred, but she said that it was used a total of five times.

Officer Bohac came to where Sergeant Marsh was holding Samaniego, possibly directing him to use the stun gun again. By this time, Samaniego's children, and perhaps other people, were screaming. At this point, Fish and Wildlife Protection Officer Ron Nelson arrived at the scene, identified himself, and told the police he would assist. They directed his attention to what he later deemed "the crowd," presumably the Samaniego children, Mrs. Crist, and perhaps Mr. Muñoz and the passenger in his car who had not been arrested. Officer Nelson stood between "the crowd" and the police.

After Sergeant Marsh stunned her either for the third or fourth time, Samaniego stood up straight and closed her eyes, with both hands behind her. Officer Bohac then threw her to the ground by putting his foot in front of her and pushing her. He got on top of her, put his knee on her neck and pressed down with increasing force in order to cause pain, and eventually handcuffed her. At some point during the arrest the officers' acts bloodied Samaniego's mouth, injured her nose, and caused pain that made her scream and cry. The stun gun bruised her neck.

Samaniego said in a deposition that, after she was fully handcuffed, and while Officer Bohac was on top of her, Sergeant Marsh stunned her neck one more time. She also said that one of the officers' acts while she was pinned on the ground broke her nose.

B. *The Criminal Proceeding*

The police charged Samaniego with fourth-degree assault,[1] disorderly conduct (i.e., "challeng[ing] another to fight or engag[ing] in fighting other than in self defense"[2]), and

1. *See* AS 11.41.230(a)(1).

2. AS 11.61.110(a)(5).

3. *See* AS 11.56.700(a)(1).

4. Samaniego also named the Kodiak Police Department as a defendant, but it is simply a branch of the City.

5. Samaniego's complaint did not specify whether she was suing Officer Bohac and Sergeant Marsh in their individual or official capacities, or both,

forcibly resisting or interfering with an arrest.[3] At her criminal trial, she conceded that she had resisted Sergeant Marsh's initial attempt to grab her wrist after he had told her that she was under arrest. A jury acquitted her of assault and disorderly conduct, but convicted her of resisting or interfering with an arrest.

C. *The Civil Suit*

Samaniego sued the City of Kodiak,[4] as well as Officer Bohac and Sergeant Marsh,[5] in tort, alleging that the officers had "use[d] excessive force in arresting [her]" (i.e., committed an assault for which the privilege to use reasonable force in making an arrest was no defense), and that the City had negligently supplied Sergeant Marsh with a stun gun without training him in its proper use. She later abandoned her failure-to-train claim. The superior court treated her complaint as raising a vicarious-liability (i.e., *respondeat superior*) claim against Kodiak based on its employment of the officers.[6]

Defendants unsuccessfully sought summary judgment on the basis that Samaniego's conviction for resisting arrest collaterally estopped her from arguing that the officers had used excessive force during that arrest. They then moved for summary judgment on the ground that the officers possessed qualified immunity from suit. The superior court set forth its view of Alaska's law of qualified immunity in a memorandum and ordered the parties to supplement their briefing. It then granted summary judgment on the basis of qualified immunity. Samaniego appeals.

III. *DISCUSSION*

A. *Standards of Review*

We review summary judgments de novo, drawing all reasonable inferences in favor of

but defendants have explicitly waived any argument that we should read her complaint only to make official-capacity claims.

6. The complaint mentioned no such claim, charging the City only with direct liability on a negligent entrustment/failure-to-train theory, but the City has chosen to concede that the complaint "can be reasonably read to include a vicarious liability claim against the City."

the nonmoving party (i.e., Samaniego) and viewing all facts in the light most favorable to her.[7] We make no attempt to weigh the evidence or evaluate the credibility of witnesses, and we assume that all facts set forth in the nonmoving party's affidavits are true and capable of proof.[8] We determine whether the parties genuinely dispute any material facts and, if not, whether the undisputed facts entitle the moving party (i.e., Kodiak and the officers) to judgment as a matter of law.[9] We use our independent judgment to resolve the legal questions raised by this case, adopting the rules that best reflect precedent, policy, and reason.[10]

B. *Common–Law Excessive Force Actions Implicate the Objective Reasonableness Standard of the Officers' Privilege and Qualified Immunity.*

Because the court below misconstrued the law to be applied when peace officers assert the defense of "immunity" or "privilege" against claims of excessive force when making arrests, the court erroneously granted the defendants summary judgment.

The officers' privilege to use force when making arrests is codified in AS 11.81.370 and AS 12.25.070. Alaska Statute 11.81.370 states in part that "a peace officer may use nondeadly force ... when and to the extent the officer reasonably believes it necessary to make an arrest." Alaska Statute 12.25.070 states in part that officers "may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person." Read together, these statutes give police officers a privilege to use reasonable force in making arrests.

As these statutes make clear, privilege analysis has both subjective and objective components. With respect to AS 11.81.370, the court must inquire into whether the police officer had a subjective belief that the level of force was necessary. This belief must also be objectively reasonable. Alaska Statute 12.25.070, on the other hand, codifies a privilege for "necessary and proper" levels of force, with no mention of the officer's personal beliefs. The court must therefore inquire into the objective reasonableness of the officer's conduct itself. Regardless of whether the individual officer actually believed that his use of force was reasonable—and regardless of the reasonableness of that belief—the officer is not privileged to use an objectively unreasonable level of force in making an arrest.

Apart from this privilege, police officers, as municipal officials, concurrently enjoy qualified immunity for certain discretionary actions. Under AS 09.65.070(d), "[a]n action for damages may not be brought against a municipality or any of its agents, officers, or employees if the claim ... (2) is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees, whether or not the discretion involved is abused." For purposes of official immunity, "discretionary" actions are those that require "personal deliberation, decision and judgment." [11] An officer's use of a certain level of force in making an arrest will almost invariably be characterized as a discretionary, rather than a ministerial, function.[12]

---

7. See *Sykes v. Melba Creek Mining, Inc.,* 952 P.2d 1164, 1167 n. 3 (Alaska 1998) (citing *Gudenau & Co. v. Sweeney Ins., Inc.,* 736 P.2d 763, 765 (Alaska 1987)).

8. *See id.*

9. See *Maddox v. River & Sea Marine, Inc.,* 925 P.2d 1033, 1035 (Alaska 1996).

10. See *Valley Hosp. Ass'n v. Mat–Su Coalition for Choice,* 948 P.2d 963, 966 (Alaska 1997).

11. *Aspen Exploration Corp. v. Sheffield,* 739 P.2d 150, 155 (Alaska 1987) (internal quotations omit-

ted). In contrast, discretionary actions in the sovereign immunity context involve broad planning and policy formulations. *See id.*

12. A legion of judicial decisions discuss the difficult judgment calls involved in deciding how much force to use in making an arrest. *See, e.g., Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); *Miller v. State,* 462 P.2d 421, 427 (Alaska 1969) (noting that we can judge the use of force in an arrest "only [by] elastic standards ... as so

■ In excessive force claims, the complainant alleges that police officers have exceeded the scope of their privilege codified in AS 11.81.370 and AS 12.25.070. We analyze qualified immunity in the context of alleged statutory violations under *Breck v. Ulmer*.[13] There we adopted the federal *Harlow v. Fitzgerald*[14] test for official immunity.[15] Under this standard, "the relevant inquiry is whether a reasonable official could have believed the challenged conduct was lawful in light of clearly established law and the facts of the case."[16] In other words, "[w]hether an official may prevail in his qualified immunity defense depends upon the 'objective reasonableness of his conduct.'"[17] Because objective reasonableness is required, officers do not enjoy immunity on account of their subjective good faith alone.[18]

■ Therefore, in the context of excessive force claims, the substantive analysis under *Breck* and *Harlow* for qualified immunity merges with the privilege analysis.[19] Each analysis requires the trial court to focus on whether the level of force used by the police officer in making an arrest was objectively reasonable under the totality of the circumstances.[20] We emphasize, though, that the reasonableness of an officer's actions is to be assessed in light of all the relevant circumstances of the case at hand.

### C. *Summary Judgment Was Erroneous.*

Given the preceding discussion, we examine the propriety of the summary judgment in a different light than the trial court did. The relevant inquiry is whether—resolving all factual disputes in Samaniego's favor—it can be said as a matter of law that no reasonable jury would find the officers' use of force to be excessive. As discussed below, this cannot be said.

Further, the trial court committed several other errors in granting summary judgment to the defendants. First, it failed to adhere to the requirement that it resolve all factual disputes in favor of the non-movant when ruling on a summary judgment motion. Second, it made an insupportable judgment as a matter of law on the reasonableness of the officers' belief that "the crowd" at the scene posed such a threat to them as to justify additional force against Samaniego. Finally, the court did not conclusively address one of Samaniego's theories of the case—namely, that the arrest itself was invalid and the officers thus forfeited any privilege they might otherwise have had—although this theory is ultimately unavailing.

much depends upon the exigencies of the situation, the gravity of the offense, and the amount of force and counterforce used or threatened"); *see also* Louis L. Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 Harv. L.Rev. 209, 218–19 (1969) (finding it "particularly clear" that police officers exercise "more than a 'merely ministerial function'" in making arrests; they "are called upon to make extremely difficult factual choices, and important, if unarticulated, policy decisions").

13. 745 P.2d 66 (Alaska 1987). Although *Breck* did not address this specific statutory provision, we have subsequently held that the *Breck* analysis applies to claims of qualified immunity under AS 09.65.070(d)(2). *See Integrated Resources Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 301–02 (Alaska 1990).

14. 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

15. *See Breck,* 745 P.2d at 71–72.

16. *Mathis v. Sauser,* 942 P.2d 1117, 1125 (Alaska 1997) (citing *Anderson v. Creighton,* 483 U.S.

635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

17. *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (quoting *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727).

18. *Cf. City of Nome v. Ailak,* 570 P.2d 162, 171–72 (Alaska 1977) (noting that any good faith defense to false arrest claim must have an objective component); *Miller,* 462 P.2d at 426–27 (noting that false imprisonment or false arrest claims are available for unlawful peaceful arrests effectuated in good faith).

19. *See Katz v. United States,* 194 F.3d 962, 968 (9th Cir.1999) ("[T]he inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim.") (quoting *Alexander v. County of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir.1995)).

20. *See id.* at 968 ("Both the second prong of the qualified immunity defense (whether a reasonable officer could have believed his conduct was lawful), and the merits of an excessive force claim focus on the objective reasonableness of the officer's conduct.").

1. *Presuming the arrest was valid, it cannot be said that no reasonable jury would find that the officers' use of force was excessive.*

a. *The superior court's analysis*

█ Summary judgment was improper here, because Samaniego submitted sworn testimony and depositions from herself and her daughter asserting that (1) she did not touch Sergeant Marsh when she interposed herself between him and Martha; (2) she never hit Sergeant Marsh or, as he has alleged, grabbed his testicles during the arrest; and (3) after her initial resistance to his attempt to grab her left hand, she did not thereafter resist being arrested and handcuffed, although she was struggling in response to the pain caused by the stun gun and by being manhandled.

Despite this evidence, the superior court stated, in its memorandum order granting summary judgment, that "Officer Marsh ... advised Samaniego that she was under arrest for disorderly conduct. Thereafter, Samaniego *fully resisted* ...." (emphasis added); "Samaniego was *actively resisting* a lawful arrest" (emphasis added); and "[Mrs. Samaniego] *forcibly* interfered in the detention of Martha Samaniego" (emphasis added). These factual findings alone warrant reversal, because in making them the court did not portray the facts in the light most favorable to the nonmovant.

Further, the superior court emphasized a theory, based on the law enforcement officers' testimony as to their subjective beliefs, that "the situation was explosive"; that there was "a very tense and explosive situation involving agitated participants and a gathering crowd"; and that there was "an immediate threat to the safety of everyone involved." The court never discussed the objective reasonableness of this theory. It never specified who was in the "gathering crowd." Again, the court's description of this element of the arrest cannot be said to portray the facts in the light most favorable to the nonmoving party.

This is so because of the court's focus on Officer Nelson's subjective impressions of the scene. On a summary judgment motion, Officer Bohac's and Sergeant Marsh's privilege depends on what a reasonable officer viewing the situation in the light most favorable to Samaniego could have believed, not on what the officers testified that they subjectively believed, or, *a fortiori*, on what Officer Nelson testified as to *his* assessment of the situation. Nelson's subjective belief is two steps removed from establishing *as a matter of law* that a reasonable officer in the position of Officer Bohac and Sergeant Marsh could have believed that his or her safety was endangered. The record implies that the "crowd" that the court reasoned was threatening to the officers comprised: José Muñoz and the one passenger who had not been arrested; Mrs. Crist; and the four Samaniego children—the two adolescent girls and their younger siblings.[21] The officers who were threatened by this "crowd" comprised the two armed INS agents and three armed police officers. It cannot be said that a reasonable jury would inevitably find that the officers were reasonable in thinking that this "gathering crowd" posed a threat to the five armed law enforcement officers on the scene, justifying a greater use of force than would otherwise be reasonable in arresting a five-feet-two-inch unarmed woman. Nevertheless, in granting the defendants' summary judgment motion based in part on the perceived "dangerousness" of the "crowd," this is exactly what the court did. This was error.

The third problematic part of the court's analysis is its conclusion that Sergeant Marsh's use of the stun gun a final time *after* Samaniego was handcuffed (a) should be analyzed separately from the other force used and (b) when so analyzed, was *de minimis* as a matter of law. This confusion is a product of the superior court's overall analytic method, and that of defendants on appeal. That method is to break down the total force used and to assert that no clearly established law barred each particular technique (the use of

21. We do not, for obvious reasons, include the two men who were handcuffed inside Officer Bohac's car in this tally.

the stun gun, the knee-in-the-neck pain compliance technique, etc.).[22]

Samaniego does not argue that any of the officers' techniques, when viewed in isolation, was unreasonable. Rather, she argues that the sum of the force used—in light of the provocation, the seriousness of her crimes, and other circumstances—was excessive. While the answer to this question is properly left to a jury, Samaniego has framed the inquiry correctly. The proper inquiry on an excessive force claim must be whether the entirety of the force used was reasonable, as we elaborate below.[23]

### b. *Analysis of plaintiff's version of facts*

■ In conducting this inquiry, a 1989 United States Supreme Court opinion is helpful. In *Graham v. Connor*,[24] the Court held that federal courts must address all excessive-force claims under an "objective reasonableness" standard.[25] While a court must ultimately evaluate the totality of the circumstances, the Court outlined three considerations to frame the inquiry: first, the severity of the crime; second, whether the suspect immediately threatens the safety of the police or others; and third, whether he or she is actively resisting or fleeing arrest.[26] This framework is persuasive, and we adopt it as an elaboration of our common-law standard of reasonable force.

Viewing the facts in the light most favoring Samaniego and resolving all disputes in her favor—as we must when we review a grant of summary judgment—the *Graham* factors all favor her. First, her crimes, accepting as we must her claim not to have hit Sergeant Marsh, were only (1) disorderly conduct in challenging him, and (2) resisting arrest by pulling her wrist away and saying, "no, leave me alone." These are but mild instances of minor crimes.

Second, as for resistance or flight, it is undisputed that Samaniego struggled and did not affirmatively cooperate with her handcuffing. Thus she can be said to have resisted arrest, even viewing the facts in the light most favorable to her. However, she did so in a very low-level way—she never struck or fled from or brandished a weapon at the officers. Such mild struggling will not bar an excessive-force claim.[27]

Third, the record does not suggest that the officers had any basis for suspecting that Samaniego herself posed an immediate threat to their safety.

Beyond *Graham*'s three enumerated considerations, defendants rely on one other circumstance within the totality of the case— the vicarious threat she posed, as it were, because of the "safety hazard to Marsh due to the crowd surrounding the officers, according to an independent witness (Nelson)." This argument lacks merit. Given the standard we have announced above, the defendants' theory must be that a reasonable jury would inevitably decide that *reasonable* police officers in their position would have perceived the "crowd" (two theretofore-coopera-

---

22. Cf. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir.1994) ("Perry urges what amounts to a segmented view of the sequence of events ... [in which] each distinct act of force becomes reasonable.... This approach misses the forest for the trees. The better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances.").

23. The court also emphasized the fact that it was in her November 1996 deposition that Samaniego first alleged that Sergeant Marsh stunned her after she was handcuffed. Possibly, the court commented on this fact to indicate that it reflected badly on Samaniego's credibility. On summary judgment, however, a court is not to weigh the credibility of witnesses. *See, e.g., Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1167 n. 3 (Alaska 1998).

24. 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

25. *See id.* at 395, 109 S.Ct. 1865.

26. *See id.* at 396, 109 S.Ct. 1865.

27. *See* James O. Pearson, Jr., Annotation, *Peace Officer's Civil Liability for Death or Personal Injuries Caused by Intentional Force in Arresting Misdemeanant*, 83 A.L.R.3d 238, 245–47 (1978) (surveying state common-law cases and noting that, while "it is difficult to isolate individual factors as being determinative," a finding of excessive force seems to relate to whether "the suspect actually struck, as opposed to merely resisting, the arresting officer").

tive men, a woman, and four children), none of whose members was armed, as a threat to their safety. Nelson's *subjective* impression, based on incomplete information, does *not* establish that no reasonable jury could reject that theory.

In short, the superior court's factual findings were in contravention of the nonmoving party's evidence, and thus warrant reversal in and of themselves. Further, reviewing the evidence de novo, it was error to decide that no reasonable jury would have found that the officers' use of force was excessive in the totality of the circumstances.

### 2. The possibility that the arrest was invalid

■ Samaniego argues briefly on appeal that Sergeant Marsh's arrest of her was unlawful and so, under AS 11.81.370(b), he had no privilege to use *any* force against her, and reversal (at least as to him [28]) is required as a matter of law. The superior court did not address this theory of the case at all, other than to assert in conclusory fashion that Samaniego "is guilty of resisting a *lawful* arrest." [29] (Emphasis added.)

Samaniego's theory is unavailing, however. Even if Marsh's announced arrest of Samaniego for disorderly conduct was illegal, once she resisted his attempt to grab her wrist, she thereby committed the *additional* offense of resisting arrest, regardless of the arrest's illegality.[30] Marsh then had probable cause to arrest her for *that,* and a privilege to use reasonable force to do so.

28. She does not argue that Officer Bohac knew or reasonably should have known that Sergeant Marsh's arrest of her was illegal, such that Bohac would forfeit any privilege as well.

29. The offense of resisting arrest does *not* require that the arrest be lawful, *see* AS 11.56.700, and Samaniego's conviction thus does not collaterally estop her to argue that the arrest was unlawful. The court's order does not explain why it concluded that her arrest was "lawful."

30. *See Miller v. State,* 462 P.2d 421, 426–27 (Alaska 1969).

31. Samaniego claims that Sergeant Marsh's initial detentions of her and Martha were illegal attempts to aid an INS fishing expedition con-

The only way that the illegality of the initial arrest could matter is if Samaniego could prove that it was pretextual and that this fact nullified the privilege Marsh would otherwise have had to use force to arrest her for the offense of resisting arrest. However, Samaniego has waived this argument.[31] Thus, whatever the scope of the privilege, the officers did not forfeit it by illegally arresting Samaniego.

### D. Samaniego Is Not Collaterally Estopped to Argue that the Officers Used Excessive Force in Arresting Her.

■ Samaniego was convicted of resisting arrest. Defendants note that it is a defense to that crime that the arrestee "may use nondeadly force upon a peace officer when and to the extent [the arrestee] reasonably believes the peace officer is using unreasonable and excessive force." This, in any event, was the jury instruction given in Samaniego's criminal trial, and she does not challenge it here. The defendants further note that Samaniego argued such a defense to the jury, and the State necessarily disproved it beyond a reasonable doubt. Therefore, the defendants argue, Samaniego is barred from now arguing that the police officers used unreasonable force in arresting her.

Defendants' argument sweeps too broadly, however, as Samaniego shows. The only relevant requirements of collateral estoppel here are that the issue "have been *actually litigated and determined* in the first action ... and the determination must have been *essential to the judgment.*" [32] These requirements have not been satisfied here.

ducted without a reasonable, articulable suspicion that she or her passengers lacked proper documentation. She notes that "the arrest was additionally illegal because the stop leading to it was illegal." This could raise a host of thorny Fourth Amendment/poisonous-tree issues, but in fact it does not, for she has waived any such claim. She prefaces her discussion of the detention's illegality by saying it is "not necessary to resolution of this claim" and concludes that "[r]egardless of whether Marsh's initial stop of Samaniego was justifiable, the arrest was not."

32. *DeNardo v. Anchorage,* 775 P.2d 515, 517 (Alaska 1989) (emphasis added); *accord Scott v. Robertson,* 583 P.2d 188, 191–92 (Alaska 1978) (requiring, for criminal conviction to have collat-

This is so because of the following: (1) the jury instruction said that a person may use nondeadly force . "when ... she reasonably believes the peace officer is using unreasonable and excessive force"; (2) Samaniego conceded in her criminal trial that she resisted Sergeant Marsh's attempt to grab her wrist when he first announced that she was under arrest; (3) she did not argue that he had theretofore used "unreasonable and excessive force"; and (4) the jury could have concluded that she committed the offense of resisting arrest as of the moment she pulled her wrist away, and so need not have reached any conclusion about whether the force that the police used *after* that moment was excessive. Because any such determination, if it was even made, was therefore not necessary to the jury's decision, it does not bar Samaniego's instant claim.

## IV. CONCLUSION

It is beyond dispute that police officers, in pursuit of their dangerous and important jobs, are often forced to make difficult decisions regarding the use of force. By extending a privilege to these officers to use force in making an arrest, our courts and legislature have recognized this reality.

Our legal system, however, must not insulate police officers from liability as to allow them to violate such a fundamental human right—the right to bodily integrity. Thus, if an officer uses unreasonable force, he or she is liable for damages. The standard of reasonableness incorporates respect for the difficult decisions police must make, since the jury's inquiry takes the specific circumstances of the arrest into account.[33] Any concerns, such as those voiced by the court below, that officers will be "second-guessed" by lawyers and judges with $^{20}\!/_{20}$ hindsight are thereby ameliorated. Juries properly instructed to consider these often confused and dangerous situations are unlikely to hold officers liable for reasonable uses of force.

We hold that the proper analysis of defendant officers' claims of privilege to rebut excessive-force allegations, pursuant to AS 11.81.370 and AS 12.25.070, is to examine the objective reasonableness of the officers' use of force in making an arrest. It was error to apply an immunity analysis driven by the officers' subjective beliefs as to the reasonableness of the force used. The lower court also erred in deciding that there were no material issues of disputed fact. The summary judgment is REVERSED. We REMAND for further proceedings consistent with this opinion.

---

eral estoppel effect, that "it [be] shown that the issue on which the judgment is offered was *necessarily decided* in the previous trial") (emphasis added).

**33.** *See, e.g., Dauffenbach v. City of Wichita,* 233 Kan. 1028, 667 P.2d 380, 386–87 (Kan.1983); *see* Pearson, supra note 27, at 247–49.