Keane–Alexander CRAWFORD,
Appellant,

v.

Kevin E. KEMP and State
of Alaska, Appellees.

No. S–11356.

Supreme Court of Alaska.

July 14, 2006.

Rehearing Denied Aug. 21, 2006.

---

Keane–Alexander Crawford, pro set.

Gene L. Gustafson, Assistant Attorney General, Fairbanks, and Gregg D. Renkes, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Alaska State Trooper Kevin Kemp arrested Keane–Alexander Crawford for disorderly conduct and performed a search of Crawford's bag incident to the arrest. Criminal charges against Crawford were dismissed, and Crawford filed suit against the State of Alaska and Kemp alleging state law tort claims and 42 U.S.C. § 1983 constitutional claims including false arrest, false imprisonment, unreasonable search and seizure, malicious prosecution, and violation of free speech. The superior court granted summary judgment in favor of the State and Kemp. Crawford does not challenge the State's argument that it is immune from suit under state and federal law and limits his appeal to claims against Kemp. We reverse the superior court's decision granting summary judgment in favor of Kemp because there are genuine issues of material fact as to whether there was probable cause for Crawford's subsequent arrest and search and whether Kemp is entitled to immunity.

1. Because factual inferences must be drawn in favor of the non-moving party, we focus on Crawford's version of the facts as articulated in

## II. FACTS AND PROCEEDINGS

### A. Factual History[1]

On December 7, 2001, Keane–Alexander Crawford was sitting in the clerk's office of the Rabinowitz courthouse in Fairbanks, drafting a motion for his divorce case. Alaska State Trooper Kevin Kemp went to the clerk's office in search of a man named Rodney who had just violated a domestic violence restraining order by calling his wife. Rodney's phone call originated from the courthouse, and Kemp was told that he should be able to find Rodney filing paperwork at the clerk's office. When Kemp arrived at the clerk's office, he approached Crawford and asked his name. Crawford replied that he did not want to tell Kemp his name and asked if Kemp was trying to arrest him.

Crawford also inquired if Kemp had a tape recorder and was recording their conversation. When Kemp asked if Crawford would like him to turn on his tape recorder, Crawford responded that he would rather just be left alone. Kemp explained that if Crawford would tell him his name, then he could verify if Crawford was the person he was looking for. Crawford refused, so Kemp asked a clerk if she knew Crawford. Kemp then returned to where Crawford was sitting and looked over Crawford's shoulder to see if he could read Crawford's name on the form he was filling out. As Kemp was walking away, Crawford raised his voice slightly and said to Kemp that "he should feel proud for being able to read over someone's shoulder." Crawford states he "wasn't shouting" but concedes that he "said it loud[ly]" because he wanted "others in the immediate vicinity to know what Kemp had done." Crawford asserts that Kemp then turned, leaned down close to Crawford's face, and told Crawford he would be arrested if he continued to speak in a disorderly manner. According to Crawford, "[i]n a voice that [Kemp] would be able to hear, but not loud enough that it would carry unnecessarily far," Crawford asked Kemp for his name and the name of his supervisor. Kemp gave Crawford his name; Crawford then left the clerk's office and ob-

his complaint, deposition, and opposition to summary judgment.

tained the name of Kemp's supervisor from Judicial Services.

Crawford returned to the clerk's office and told Kemp that he had the name of his supervisor and that he also knew how to write reports. Kemp responded that he had a tape recorder and that he was taping their conversation. At this point, Adam Bijan, a friend of Crawford's, returned to the clerk's office. Crawford told Bijan, in a voice that was "not exceedingly loud," that Kemp was bothering him. Crawford returned to the table where he was working and from his seated position turned and asked Kemp "to make sure no harm came to the tape." Kemp then approached Crawford, who remained sitting, leaned very close to him, and told Crawford that he had been repeatedly warned his speech was disorderly and Crawford would be arrested if he spoke again. As Kemp was warning Crawford not to speak, a small amount of spittle from Kemp's mouth landed on Crawford's face. Crawford responded by asking Kemp to stop spitting in his face. Kemp warned Crawford again to stop speaking or he would be arrested for disorderly conduct. Despite this warning, Crawford repeated his earlier request that Kemp stop spitting in his face. Kemp then told Crawford that he was under arrest for disorderly conduct, handcuffed Crawford, and proceeded to search Crawford's clothing. Kemp also searched Crawford's bag, located a wallet and two driver's licenses, and proceeded to search through the remainder of the bag. During this process, Crawford asked a member of the clerk's office to retain a copy of the security videotape and asked Kemp if the tape recorder was still running.

Several clerks witnessed this incident and three different clerks testified that Crawford was "loud and disruptive," that Crawford's voice was "loud enough to get my attention," and that Crawford was repeatedly asked to "calm down." But Crawford's friend, Bijan, was also a witness to the event. His affidavit supports Crawford's version of events, stating that the complete incident between Kemp and Crawford lasted approximately ten minutes; that both Kemp and Crawford spoke in a normal tone of voice; and that no one present in the clerk's office indicated that the incident bothered them or asked Crawford to lower his voice.

Kemp placed Crawford in a cell at the courthouse for approximately an hour. Crawford was then transported to the Fairbanks Correctional Center where he was searched and fingerprinted. Crawford was released on bail at 1:00 a.m. the following day. On December 9, 2001, Kemp filed a complaint, alleging that Crawford was arrested because he "made unreasonably loud noise" in a public place and "created a hazardous condition for others." On December 27, 2001, prosecutors dismissed the criminal charges against Crawford.

### B. Procedural History

On January 18, 2002, Crawford filed a complaint against the State of Alaska and Kemp, and, after amending it twice, Crawford's final complaint alleged claims of violation of his right to free speech, unreasonable search and seizure, unlawful imprisonment, malicious prosecution, and failure by the State to adequately train and supervise Kemp. Crawford claimed damages for long-term loss of earning potential, physical and mental pain and suffering, and punitive damages, and also requested expungement of his arrest record. On January 9, 2003, Kemp filed a motion for summary judgment, arguing that his actions were lawful and that both he and the State are immune from suit.

On January 28, 2003, Crawford filed a notice with the superior court stating that he dismissed all claims against the State. The superior court treated Crawford's notice as a motion for voluntary dismissal under Alaska Civil Rule 41(a)(1). The State opposed this motion for voluntary dismissal and argued that summary judgment should be granted with prejudice.

On November 14, 2003, Superior Court Judge Richard D. Savell issued an order granting summary judgment to Kemp and the State. Judge Savell found that (1) there was sufficient probable cause to arrest Crawford for disorderly conduct and perform a search incident to arrest; (2) the State of Alaska is immune from suit under both state and federal law; (3) Kemp has qualified immunity under state law as a public official;

(4) Kemp has immunity under federal law for the civil rights claims brought under § 1983 and the constitutional claims; and (5) Crawford's constitutional rights were not violated. Crawford appeals the superior court's decision granting summary judgment in favor of Kemp.

## III. DISCUSSION

### A. Standard of Review

■ Orders granting summary judgment are reviewed de novo, viewing all facts and drawing all reasonable inferences in the light most favorable to the party against whom judgment was entered.[2] "It is well established that 'the evidentiary threshold necessary to preclude the entry of summary judgment is low.' "[3]

### B. Lawfulness of Arrest and Search

■ Crawford contends that he was unlawfully arrested for disorderly conduct and that the arrest and search incident to arrest violated his constitutional rights. We first examine the superior court's determination that Crawford's claims should be dismissed because the arrest and search were lawful. Disorderly conduct is a misdemeanor under AS 11.61.110. The relevant sections of AS 11.61.110 provide:

(a) A person commits the crime of disorderly conduct if,

. . . .

(2) in a public place . . . and with intent to disturb the peace and privacy of another or with reckless disregard that the conduct is having that effect after being informed that it is having that effect, the person makes unreasonably loud noise; [or]

. . . .

(6) the person recklessly creates a hazardous condition for others by an act which has no legal justification or excuse[.]

■ The misdemeanor complaint against Crawford charged that he committed disorderly conduct by making an unreasonably loud noise and by recklessly creating a hazardous condition. Crawford maintains that his voice was not unreasonably loud given the totality of the circumstances and that he did not create a hazardous condition. Kemp responds that Crawford's arrest was lawful because it was supported by probable cause. "Probable cause to arrest exists if the facts and circumstances known to an officer would support a reasonable belief that an offense has been or is being committed by the suspect."[4] Probable cause is determined objectively and "requires only a fair probability or substantial chance of criminal activity, not an actual showing that such activity occurred."[5] Kemp argues that because there was a fair probability that Crawford was being unreasonably loud, there was probable cause to arrest Crawford.

■ The focus of our inquiry is on the reasonableness of Kemp's belief that Crawford's words were unreasonably loud or created a hazardous condition. Although all facts must be viewed in a light most favorable to Crawford, "the reasonableness of an officer's actions is to be assessed in light of all the relevant circumstances of the case at hand."[6] Alaska Statute 11.61.110(b) defines noise as unreasonably loud "if, considering the nature and purpose of the defendant's conduct and the circumstances known to the defendant, including the nature of the location and the time of day or night, the conduct involves a gross deviation from the standard of conduct that a reasonable person would follow in the same situation." This provision goes on to clarify: " 'Noise' does not include speech that is constitutionally protected."[7]

**2.** *Samaniego v. City of Kodiak*, 2 P.3d 78, 82–83 (Alaska 2000).

**3.** *Hammond v. State, Dep't of Transp. & Pub. Facilities*, 107 P.3d 871, 881 (Alaska 2005) (quoting *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1032 (Alaska 2002)).

**4.** *State v. Joubert*, 20 P.3d 1115, 1118–19 (Alaska 2001).

**5.** *Id.* at 1119 (quoting *Van Sandt v. Brown*, 944 P.2d 449, 452 (Alaska 1997)).

**6.** *Samaniego*, 2 P.3d at 84.

**7.** AS 11.61.110(b).

The superior court concluded that probable cause existed to arrest Crawford for making unreasonably loud noise because "[r]easonable behavior in the lobby of the clerk's office, where members of the public gather to do research and file papers, means using a normal speaking voice." But this finding seems to improperly discount Crawford's argument that Kemp arrested him because Crawford continued to speak after Kemp repeatedly warned him that he would be arrested if he simply "spoke any further." In his complaint, Crawford described the sequence of events directly before the arrest:

57. I turned in my chair to face Kemp and in a normal speaking tone said that I would like him to make sure no harm came to the tape because I would be requesting a copy of it.

58. Kemp then approached me, this time on my right side.

59. He came right to my side and leaned down close to my face, placing his left hand on the back of my chair, behind me.

60. Kemp was now between me and A.B.

61. Kemp said that he had repeatedly warned me that my speech was disorderly, and that he would arrest me if I spoke any further.

62. I said that I was still sitting and that he had approached me.

63. I said that it was him who had his hand on my chair and I didn't think that made me disorderly at all.

64. He then said that he wasn't going to warn me anymore and that if I spoke anymore he would arrest me for disorderly conduct.

65. As he had been speaking he was also getting increasingly close to my face. After one of his warnings to cease speaking a small amount of spittle came out of his mouth and landed on my face.

66. I said to him that he had spit on my face, I asked him to please stop spitting on my face.

67. He did not back up and he said to stop speaking or he would arrest me for disorderly conduct.

68. I asked him to please stop spitting in my face.

69. He stayed there in front of me leaning towards me without backing up and said he had warned me already that my speech was having a "disorderly" effect on him and that if I didn't stop speaking he would arrest me for "disorderly conduct".

70. I said to please stop spitting in my face.

71. He said that's it, stand up, you're under arrest.

Crawford's recitation of events in his complaint was supported by his deposition testimony, in which he recounted that Kemp told him that he would be arrested if he continued to speak to Kemp: "He's saying I cannot speak to him because if I speak to him at all that's disorderly conduct and I—I probably wouldn't have been arrested if I had just shut up right then and I didn't say anything but I knew that I wasn't required by law to just shut up like he wanted me to." When asked if Kemp had instructed him to calm down or keep his voice down, Crawford responded, "No. He didn't. . . . He said don't talk to me." Crawford testified that "every time [Kemp] says cease speaking—I remember that—he said stop talking, stop talking, that's disorderly conduct and I'll arrest you and I said no it's not." Crawford maintains that Kemp never said "don't be loud" or "don't annoy other people."

The superior court's probable cause determination also failed to give any weight to Bijan's affidavit, which stated that throughout the ten-minute incident, both Crawford and Kemp "spoke to each other at about the same level of voice volume, a very formal and normal tone of . . . voice." Bijan also recounts that "[n]o one indicated . . . that this incident bothered them. During this incident, no one (in the lobby of the clerk of the court) asked anyone to lower their voices."

Crawford's version of events, set out in his complaint and his deposition, and the affidavit of his friend, Bijan, raises a genuine issue of material fact as to whether the facts and circumstances known to Kemp would support a reasonable belief that Crawford's words were unreasonably loud or created a hazard-

ous condition. We therefore conclude that the superior court could not determine as a matter of law that Kemp acted reasonably or that a jury would inevitably find that Kemp was reasonable in believing that Crawford's actions justified an arrest for disorderly conduct. Viewing the facts in the light most favorable to Crawford,[8] we conclude that there is a genuine issue of fact as to the lawfulness of Kemp's arrest of Crawford.[9]

### C. Immunity

 Crawford alleges that his federal constitutional right to free speech and his right to be free from search and seizure and malicious prosecution were violated and that Kemp should be subject to personal civil liability under 42 U.S.C. § 1983.[10] Crawford also makes a number of state law tort claims against Kemp stemming from his arrest for disorderly conduct. He claims that Kemp is not entitled to qualified immunity from these claims because Kemp acted with malice,[11] and no reasonable officer in Kemp's position could have believed his actions warranted arrest for disorderly conduct.

 With respect to Crawford's constitutional claims, a law enforcement officer is entitled to qualified immunity if, in light of clearly established law and the information available to the officer at the time, a reasonable officer could have believed the arrest was lawful.[12] "The law is 'clearly established' if the contours of the right are sufficiently clear that a reasonable official would understand that his actions violate that right."[13] The United States Supreme Court has interpreted the reach of qualified immunity broadly and has explained that "[o]nly where the [arrest] warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable, will the shield of immunity be lost."[14] The Supreme Court acknowledged that "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause" and clarified that officers should be granted immunity for

---

8. *See Samaniego*, 2 P.3d at 84–85; *see also Van Sandt*, 944 P.2d at 451–53 (holding that the issue of whether a trooper could have reasonably believed that probable cause existed to search a house was a question for the jury).

9. Because we have determined that there is a genuine issue of material fact as to whether Crawford's arrest was lawful, we remand to the trial court the question whether Kemp's search of Crawford and his bag incident to his arrest was lawful.

10. To sustain an action under 42 U.S.C. § 1983, Crawford must show: (1) that the conduct complained of was committed by a person acting under color of state law and (2) that the conduct deprived the plaintiff of a constitutional right. *See, e.g., Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). It is undisputed that Kemp was acting under color of state law at the time he arrested Crawford and searched his person and bag.

11. We note that ordinarily immunity questions should be decided long before trial. *Van Sandt*, 944 P.2d at 451 n. 4 (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Official immunity shelters the state and government officials from all aspects of a lawsuit, including pre-trial discovery; it is not solely a shelter from liability. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Karen L. v. Dep't of Health & Soc. Servs.*, 953 P.2d 871, 879 (Alaska 1998).

12. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Breck v. Ulmer*, 745 P.2d 66, 71–72 (Alaska 1987) (adopting federal precedent as articulated in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), to determine whether qualified immunity should be conferred for alleged violations of a statute or constitutional rights, and holding that officials were entitled to qualified immunity so long as they did not violate "clearly established" law); *see also Samaniego*, 2 P.3d at 84 (applying the federal test for official immunity to a claim for excessive force).

13. *Van Sandt*, 944 P.2d at 452 (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034).

14. *Malley v. Briggs*, 475 U.S. 335, 344–45 & n. 6, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (citing *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)) (explaining that the same standard of objective reasonableness applied in the context of a suppression hearing defines qualified immunity and that any distinction between a search warrant and arrest warrant does not affect the degree of immunity accorded to an officer); *see also Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (explaining that the deference owed officers facing suits for excessive force is not qualitatively different from the probable cause inquiry).

reasonable mistakes as to the legality of their actions.[15] "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."[16] In explaining our decision to craft an objective standard for qualified immunity claims under Alaska law for alleged violations of statutes or the Alaska Constitution, we declared that "[p]rotecting the exercise of judgment of local officials from the undue interference caused by the threat of litigation is necessary to promote the public interest."[17]

Although we recognize the policy in favor of deciding immunity issues prior to trial in order to insulate officers from claims based on reasonable mistakes, the objective reasonableness of Kemp's decision to arrest in this case presents a question of fact that requires resolution by a jury. The superior court found that Kemp's belief that Crawford had committed disorderly conduct was "well-grounded," and that "a person in Kemp's position would entertain probable cause to believe that Crawford's conduct was disorderly." But Crawford's version of events raises a material question of fact about whether Kemp's belief was so "well-grounded."

First, Crawford has raised a genuine issue of material fact as to whether he was making "unreasonably loud noise," which by definition factors in "the nature and purpose of the defendant's conduct and circumstances known to the defendant, including the nature of the location and the time of day or night."[18] Given the context, the conduct must involve a "a gross deviation from the standard of conduct that a reasonable person would follow in the same situation" and "does not include speech that is constitutionally protected."[19]

15. *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151.

16. *Id.* at 202, 121 S.Ct. 2151.

17. *Breck,* 745 P.2d at 71.

18. AS 11.61.110(b).

19. *Id.*

20. *See, e.g., Richardson v. Bonds,* 860 F.2d 1427, 1433 n. 5 (7th Cir.1988) (citing Justice White's concurrence in *Terry v. Ohio,* 392 U.S. 1, 34, 88

It is undisputed that the confrontation between Crawford and Kemp began when Kemp asked Crawford to identify himself and Crawford refused. It is well-established, and Kemp acknowledged in his deposition testimony, that Crawford was not under a legal obligation to tell Kemp his name and was not required by law to produce identification for Kemp.[20] Crawford became agitated when, after Crawford refused to give Kemp his name, Kemp proceeded to look over his shoulder and read Crawford's name anyway. Perceiving that Kemp was "invading [Crawford's] personal space," Crawford testified that he raised his voice and told Kemp that "you ought to feel proud of yourself for being able to read over someone's shoulder. And I wanted everybody to know that that [was] exactly what he did...." Crawford further explained that he "hadn't done anything wrong" and that he "hadn't broken any law" and then Kemp "came back and snuck up behind [him] and read over [his] shoulder." When Crawford verbally objected to Kemp's behavior, according to Crawford, Kemp repeatedly told him to "stop talking" or he would be arrested for disorderly conduct. Crawford protested and responded that merely speaking was not disorderly conduct. Crawford also claims that the event that culminated in his arrest was when, after Kemp told him to stop speaking and spittle landed on his face, Crawford said "please stop spitting in my face."

Drawing all inferences in favor of Crawford, Crawford's response could be viewed as constitutionally protected verbal opposition to what he perceived as over-reaching by a police officer. Kemp concedes that there was strictly verbal contact between himself and Crawford. Kemp also admits that Crawford never approached him and never used

S.Ct. 1868, 20 L.Ed.2d 889 (1968), which first approved of brief noncustodial police interrogation based on reasonable suspicion, for the proposition that "of course, the person stopped is not obliged to answer, ... and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation," and citing multiple circuits that have recognized Justice White's statement as authoritative).

"foul language." While Kemp states in his deposition that Crawford "shoved [his] chair back and—took a—defensive position or aggressive position scooting back" like he was "getting ready to stand up out of [his] seat," he did not state in his affidavit in support of the complaint against Crawford that Crawford engaged in any threatening behavior. Therefore, under the facts as presented by Crawford, and to some degree corroborated by Kemp, Crawford was only engaged in communicative utterances directed at a police officer which under both United States and Alaska law are entitled to constitutional protection.

■ It is well-settled that "[u]sually, arguing with a police officer, even when using profane and insulting words will not be enough to constitute disorderly conduct unless the words are coupled with threatening behavior." [21] As the United States Supreme Court observed in *City of Houston, Texas v. Hill* in a plurality opinion striking down an ordinance that prohibited speech that "in any manner . . . interrupt[s]" an officer, "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state," [22] and it is therefore constitutionally protected.

In our decision in *Anniskette v. State*, [23] we acknowledged that police officers, even when faced with verbal communications that could be described as "fighting words"—words that provoke in the average listener an immediate violent response—should exercise more restraint than the private citizen. We cited favorably language from the American Law Institute, which noted:

> Insofar as the theory of disorderly conduct rests on the tendency of the actor's behavior to provoke violence in others, one must suppose that policemen, employed and trained to maintain order, would be least

likely to be provoked by disorderly responses. [24]

According to Crawford, when Crawford was seated, Kemp bent over Crawford and told him that he was engaging in disorderly conduct because Crawford was "trying to annoy" Kemp and was "trying to make him feel disorderly." The affidavit filed by Kemp in support of his complaint against Crawford further indicates that Kemp made the arrest at least in part because he was annoyed by Crawford's behavior. Kemp reported that "Crawford was . . . repeatedly advised that he would be arrested for disorderly conduct if he continued to (harass and annoy) initiate contact (3–4 times) with Sgt. Kemp."

As we noted in *Anniskette*, "[t]hat the officer was personally offended . . . does not render the defendant's conduct a crime. That would be to make the terms of the statute and the content of the First Amendment shift with the mentation and emotional status of the recipient of the verbal communications. Under an objective standard it is not permissible to make criminality hinge upon the ideological vicissitudes of the listener." [25] Under the facts as described by Crawford, Kemp warned Crawford that his speech was having a disorderly effect on Kemp, and that Crawford would be arrested if he "spoke anymore." From the fact that Kemp was irritated with Crawford does not flow the inevitable conclusion that Crawford was grossly deviating from the standard of conduct that a person would follow in the same situation. Nor does it follow that a reasonable officer in Kemp's position would similarly be provoked to make an arrest. The constitutional protection of verbal communications directed at police officers was well-established when Kemp arrested Crawford, and therefore a fact finder might find that Crawford's version of events was credible and that he was arrested for conduct which was entitled to constitutional protection and therefore did not constitute "noise"

---

21. 12 Am.Jur.2d, *Breach of Peace and Disorderly Conduct* § 33 (2005).

22. 482 U.S. 451, 462–63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).

23. 489 P.2d 1012 (1971).

24. *Anniskette*, 489 P.2d at 1015 n. 5 (citing Model Penal Code § 250.1, Comment at p. 14 (Tent. Draft No. 13, 1961)).

25. 489 P.2d at 1015.

within the meaning of the disorderly conduct statute.[26]

Even if Crawford did not raise a material issue of fact as to whether his constitutional rights to free speech were violated, he did raise a genuine issue of material fact as to whether there was probable cause to believe that the volume of his voice was "unreasonably loud" and therefore whether there was probable cause to believe that his arrest was lawful. According to Bijan, Crawford and Kemp "spoke to each other at about the same level of voice volume, a very formal and normal tone of ... voice." Bijan also offered evidence that "[n]o one indicated that this incident bothered them" and "no one ... asked anyone to lower their voices." While Crawford himself admitted that he was at times "loud," he qualified his admission with statements such as he "wasn't shouting," and was "not exceedingly loud." Kemp testified that Crawford was at his loudest when Crawford was asking Kemp to stop spitting in his face. We have acknowledged that the disorderly conduct statute limits not the content of speech but the time, place, and manner of speech to avoid excess noise.[27] And we agree with the superior court that weight should be accorded to the fact that Crawford's admittedly "loud" speech took place in the clerk's office of the courthouse, where a reasonable speaking volume should be used. But considering the nature of the confrontation, as required by the disorderly conduct statute, it is not clear that as a matter of law Kemp had probable cause to believe that Crawford's conduct involved "a gross deviation from the standard of conduct that a reasonable person would follow in the same situation."[28] Whether a reasonable officer could have believed that the arrest was lawful depends on the resolution of factual disputes as to what transpired.

Crawford further raises a question of fact as to whether a reasonable officer could believe that Crawford was recklessly creating a hazardous condition for others. According to both Crawford and Kemp, for much of the encounter between Crawford and Kemp, including the events immediately leading up to Crawford's arrest, Crawford was seated and Kemp was standing above him. While Kemp testified that he was concerned that Bijan and Crawford would join together to resist Crawford's arrest, Crawford testified that when he was arrested, he "couldn't see [Bijan] because [Bijan] was on the other side of [Kemp] and [Kemp] was right there." Given Kemp's physically dominant position, it is not clear that as a matter of law a reasonable officer could find that Crawford was creating a hazardous condition for others.

We therefore conclude that Crawford has raised a genuine issue of material fact as to whether a reasonable officer in Kemp's position, when faced with the factual scenario viewed most favorably to Crawford, could have believed that the arrest for disorderly conduct was lawful.

 Even if the superior court were to determine that a reasonable officer in Kemp's position could have believed that the arrest was lawful, and that Kemp is therefore immune from suit with respect to Crawford's constitutional claims, the inquiry does not end there. When considering whether Kemp is immune from suit on Crawford's state law tort claims, a subjective test comes into play. Kemp's motive becomes relevant because "a public official is shielded from liability only when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt."[29] When viewing the facts in the light most favorable to Crawford, an issue of material fact has

---

**26.** While in *Earley v. State* the court of appeals upheld AS 11.61.110(a) and (b) as constitutional as applied to the facts of that case, where an arrest was made when Earley was loud and belligerent at a late hour, a citizen informant had complained, and the police had indications that Earley would have continued to disturb the peace of his neighbors unless he was taken into custody, the court of appeals expressly acknowledged that what saved the statute from being unconstitutionally overbroad was the fact that the statute provides that " 'noise' does not in-

clude speech that is constitutionally protected." *Earley v. State*, 789 P.2d 374, 376 n. 2 (Alaska App.1990).

**27.** *Id.*

**28.** AS 11.61.110(b).

**29.** *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 158 (Alaska 1987).

been raised about whether Kemp's decision to arrest Crawford was made because he was annoyed with Crawford rather than because he had a good faith belief that the law had been violated. Because a factual issue has been raised as to whether Kemp's arrest was made for an impermissible or pretextual purpose, we reverse the superior court's grant of summary judgment on Crawford's state law tort claims.

■ As a final matter, we note that Crawford does not challenge or dispute the State's argument that it is immune from suit under both state and federal law. Claims for false arrest and false imprisonment against the State are not actionable under state law.[30] The State is statutorily immune for state tort law claims under Alaska's Tort Claims Act, AS 09.50.250.[31] Crawford also originally filed claims against the State for violation of federal law, specifically the Civil Rights Act of 1871, 42 U.S.C. § 1983. Section 1983 permits a cause of action against a public official in his personal capacity for money damages when that official violates a person's constitutionally protected rights.[32] But the United States Supreme Court has specifically held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."[33] The superior court thus correctly found that all § 1983 claims must be dismissed to the extent that they seek money damages from the State, and we leave this decision undisturbed.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the superior court's grant of summary judgment in favor of Kemp and REMAND this case for further proceedings consistent with this opinion.

---

30. AS 09.50.250.

31. AS 09.50.250(3) grants the State statutory immunity for claims arising out of "false imprisonment, false arrest, malicious prosecution, [and] abuse of process."

32. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (distinguishing between personal-capacity and official-capacity suits and explaining that, while "personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of law ... an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity").

33. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Brady v. State,* 965 P.2d 1, 20 n. 72 (Alaska 1998) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office".); *Robison v. Francis,* 777 P.2d 202, 203 (Alaska 1989) (finding no compelling reason to conclude that states are persons under § 1983).