BROCKMAN, Appellant, vs. BRANDENBURG, Respondent.

*September 12—October 9, 1928.*

For the appellant there was a brief by *Cady, Strehlow & Kaftan* of Green Bay, and oral argument by *Robert A. Kaftan.*

*M. E. Davis* of Green Bay, for the respondent.

OWEN, J. Plaintiff owns forty acres of land adjoining on the south forty acres of land owned by the defendant. A rail fence has been maintained between these two forties for a period of twenty-six years, during which time the de-

fendant and his predecessors in title have cultivated and used the land up to the rail fence. The plaintiff claims that the true line between the forties is south of said rail fence, a distance of seventy-nine feet at the west end and forty feet at the east end.

Plaintiff bought his forty in 1910. Within a year after he bought it he had a survey made by the county surveyor of the south boundary line, who located the line as above indicated. This was about sixteen years before this action was commenced. Shortly thereafter plaintiff, with a crew of men, went on the land in question, with material and implements sufficient to build a fence clear across the south end of the boundary line, as shown by the survey. Defendant's father and predecessor in title appeared on the scene and a dispute followed between him and the plaintiff as to where the true boundary line was. Defendant claimed it was sixteen feet north of the rail fence, while plaintiff claimed it was south of the rail fence, on the line indicated by the surveyor. It was finally agreed that they would both join in getting a surveyor, and that they would put the fence on the true line. Plaintiff thereupon suspended further operations in the building of the fence. Neither party, however, ever did anything in the matter of securing another survey. Within a few days defendant's father consulted a lawyer, who wrote the plaintiff warning him to keep off the defendant's land. About two weeks after the first entry plaintiff again attempted to build a fence on what he believed to be the true line. He set some posts, which were chopped down as fast as he put them up by the defendant's father. Both sides worked about three quarters of a day, plaintiff's party setting posts and the other party cutting them down. Both parties then retired from the scene of hostilities, and nothing further was ever done until the commencement of this action, except that in the following spring the Brandenburgs threw the posts which had been cut down over the fence on

plaintiff's side. It is proper to say that from that time until the commencement of this action the parties were in continual dispute. The matter was taken up in the church to which the parties belonged, but no settlement was obtained.

At the conclusion of the testimony it was agreed that the true line between the forties was as established by the survey already mentioned. The court was of the opinion that the defendant and his father had been in the uninterrupted, adverse, open, and exclusive possession of the strip of land in question for a period of twenty years or more prior to the commencement of the action, and so determined, "unless the jury should find that an agreement was made between Henry Brandenburg and Charles Brockman to make a survey and determine where the true line was and that they would put their fence on the true line as determined by said survey; that if such agreement was made, that the answer to the second question should remain open for the court to decide as to what the effect of such an agreement was and whether it interrupted the adverse and exclusive possession of the defendants." The court submitted to the jury the sole question: "Was it agreed by and between Henry Brandenburg, father of the defendant, and the plaintiff, Charles Brockman, that they would have the lands surveyed, and where a survey showed the true line to be they would put the line fence there?" The jury answered this question in the affirmative. In dealing with the matter after verdict, the court expressed doubt as to whether the verdict of the jury was supported by the evidence, but concluded that, even though such agreement was made, it did not toll the statute or interrupt the adverse possession.

The evidence fully and completely established the adverse possession of this strip on the part of the defendant and his predecessors in title for more than twenty years prior to the commencement of this action, unless such possession was

interrupted by the successive entries upon the land for the purpose of building a fence or by the making of the agreement for a resurvey of the line. Whether at common law the entries upon the land for the purpose of building a fence were such as to interrupt the running of the statute of limitations, we are not called upon to determine, because sec. 330.04, Stats., provides: "No entry upon real estate shall be deemed sufficient or valid as a claim unless an action be commenced thereupon within one year after the making of such entry and within twenty years from the time when the right to make such entry descended or accrued." In order that such entry constitute an interruption of the adverse possession it was incumbent upon plaintiff to commence an action within one year after such entry. *Illinois S. Co. v. Paczocha,* 139 Wis. 23, at p. 34, 119 N. W. 550; *Ferguson v. Bartholomew,* 67 Mo. 212; *Donovan v. Bissell,* 53 Mich. 462, 19 N. W. 146; Wood, Limitations (4th ed.) 270.

Nor do we think the agreement to procure a resurvey, if such agreement were made, interrupted the adverse character of the possession. The result of this agreement was to leave the situation *in statu quo.* The defendant retained the possession of the land, still claiming title thereto. He did not abandon the land, nor did he at any time admit that plaintiff's contentions were correct. The plaintiff left the premises, left defendant's father in possession thereof, and he continued to hold and occupy them as he always did. The fact is, there was a dispute concerning the boundary line, and to settle this dispute they agreed to call a surveyor, but the defendant's father was left in possession thereof claiming title thereto. The character of his possession was not changed, and we can see nothing in this incident that can be construed as an interruption of his adverse possession of the land.

The trial court quieted the title to this strip in the defend-

ant. In the judgment the strip is described as bounded on the north "by the old rail fence at such places where it still exists, and at all other places by the wire fence placed there by defendant except such parts thereof as lie north of the line where the old rail fence used to be before such wire fence was put there." The old rail fence was an old worm rail fence and presents a jagged line of little triangles on each side of the fence. As defined by the court, the north boundary line of this strip is not a straight line but a jagged line, following the exact contour of the old rail fence. The north boundary line should be fixed at the center of this fence. Although the physical construction of these fences occupied a space of considerable width, they were intended as line fences, and they should be so treated. Defendant claims that this fence constituted the boundary line between the two forties. His claim of title, therefore, was only to the center of this fence. Even though he may have had possession of little triangles beyond the center of the fence, he did not claim title thereto. We observe further that the description in the judgment is not a permanent one. It probably could be located as long as the fence remains where it is now. It seems to us that the strip should be described by metes and bounds, if there is to be a permanent settlement of the controversy. The parties to this action should provide for a survey of the strip and its description by metes and bounds inserted in the judgment. At any rate, the judgment should be modified by fixing the north boundary as the center line of the worm fence. In order that the description may be made more definite in the judgment, it will therefore be necessary for us to reverse the judgment.

*By the Court.*—Judgment reversed, and cause remanded with instructions to modify the judgment as herein indicated; respondent to recover costs.

ESCHWEILER, J., dissents.