*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHAY HURD, | ) | |
| | ) | Supreme Court No. S-17104 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-16-00584 CI |
| v. | ) | |
| | ) | O P I N I O N |
| LARRY E. HENLEY, | ) | |
| | ) | No. 7497 – December 31, 2020 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran and Lance Joanis, Judges.

Appearances: Andy L. Pevehouse and Noah H. Mery, Gilman & Pevehouse, Kenai, for Appellant. Larry E. Henley, pro se, Soldotna, Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Stowers, Justice, not participating.]

BOLGER, Chief Justice.

## I. INTRODUCTION

Shay Hurd appeals the superior court's determination that his adjoining neighbor, Larry Henley, adversely possessed a portion of his land. Hurd and Henley share a boundary line that Henley first encroached on by building a shed and then by building a larger shop. Hurd sued, and the superior court ultimately awarded the area

originally occupied by Henley's shed and the area surrounding it to Henley, but not the larger area with the shop.

The superior court did not err when it found that Henley regularly graveled and parked vehicles in the area granted to him as adversely possessed. Henley's activities on that area were sufficient to constitute adverse possession. The superior court adequately defined the area adversely possessed by referencing landmarks with locations readily ascertainable from the record. We interpret the "good faith but mistaken belief" required for adverse possession by AS 09.45.052(a) to require only subjective good faith; therefore, the superior court did not clearly err by determining Henley occupied the former shed area due to a good-faith belief the land was his. We thus affirm the superior court's decision awarding title to the former shed area to Henley.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Henley and Hurd are neighbors who live on Skyline Road in Soldotna: Henley on Lot 6-A to the north and Hurd on adjacent Lot 6-B to the south. Henley received his lot as a gift in 2001. At that time, Henley's Lot 6-A was a treed lot with no improvements, and Hurd had not yet purchased his Lot 6-B.

Henley hired Hall Quality Builders to construct a home on the lot later in 2001. As part of the project, Henley quitclaimed his interest in the property to Hall Quality Builders, who quitclaimed the property back to Henley after the home was built. No as-built survey was provided to Henley. Improvements to the lot included excavating an eastern portion of Henley's lot and removing trees. When he took possession back, Henley assumed Hall Quality Builders knew the location of the boundaries of his property and had cleared and excavated within those boundaries. Henley later testified that he located three boundary markers in the ground after retaking possession of the lot

but provided inconsistent testimony whether he found a marker on the southeastern corner of his property.

In 2003 Henley built a 12-by-16-foot shed on skids in the contested area. The shed lay across the southern border from Henley's property, on the northern edge of Lot 6-B. In a deposition, Henley stated he had "eyeballed" the boundary of his property before placing his shed, noting that "if there is a problem, I can move it because it's on skids." At trial Henley testified to his state of mind when building the shed: "I thought I was on my land. So if I was off, I figured it wasn't very much." Henley said he believed the shed was on his land because he assumed that Hall Quality Builders would not have excavated and cleared beyond the property boundaries.

Henley also made use of the disputed area near the shed, storing items inside and outside the shed, placing a picnic table alongside the structure, and building a deep-pit barbeque. Henley graveled, installed portable carports, and parked vehicles, boats, and trailers in the area leading up to the shed.

In 2009 Hurd purchased Lot 6-B directly to the south of Henley's Lot 6-A. Henley's shed had already been built on Hurd's property. Hurd walked his lot with the previous owner and was unsure where the northeast corner of his property precisely lay.

In 2011 Hurd approached Henley to tell Henley he was planning on building his own shed. During the conversation, Henley suggested they build a privacy fence and proposed surveying the property line in preparation for it. No fence was built, and no joint property line survey was conducted.

In 2012 Henley began constructing a detached shop, again relying on the excavation work by Hall Quality Builders to estimate the property dividing line. He began excavating a foundation for a 36-by-64-foot shop. He installed a large gravel pad

extending from the shed area to the eastern boundary of his lot to serve as a foundation. The pad straddled the true south/north property line between his and Hurd's property.

Concerned about potential encroachment, Hurd tried to locate the northeastern border between his and Henley's properties with the help of a visiting friend who conducted surveys for the State of Minnesota. Even with the aid of a metal detector, Hurd and his friend could not find any rebar pin or stake marking the northeast/southeast boundary between the two properties. Using a hundred-foot tape and compass, they assessed where the demarcation pin should have been and determined a significant portion of Henley's gravel pad foundation encroached on Hurd's property. However, instead of contacting Henley, Hurd simply stuck a makeshift spruce stake with his name on it where he and his friend assessed the property boundary marker should have been. Hurd testified that he thought Henley would see the stake and approach him to talk about the issue. Hurd also testified that once construction began again, he had doubts that he was correct about the real property line and decided not to bring it up with Henley.

In 2015 Henley finished erecting his shop. In April and May 2016 Hurd had the property professionally surveyed and discovered Henley's shop significantly encroached on his property. He filed suit soon after.

B.     Proceedings

Hurd filed an action against Henley in August 2016 for trespass, negligence, slander of title, and to quiet title to his property. Henley counterclaimed to quiet title to the contested property, asserting that he had adversely possessed the disputed area.

Following a bench trial the superior court concluded Henley had adversely possessed a portion of Hurd's land and defined that portion as the "area from where [Henley's] well is located to where [Henley's] shed used to stand." The court noted that

although Henley had moved his shed prior to the suit, Henley had provided many photos to the court to "aid in determining the location of the shed." The superior court mentioned that it had a survey of the encroachment only as of 2016, making it difficult to accurately map out the then-current state of the adversely possessed area. The superior court added that the adversely possessed area "includes a small portion of the land north of the shed where the picnic table was located" and ordered the land be surveyed in order to correctly define the space. The superior court attached a drawing to aid the parties in locating the adversely possessed portion, with its eastern edge anchored on the southeast corner of Henley's garage.

The superior court also found that Henley had believed in good faith that the contested area was his property. In the court's view, Henley's "good faith mistake" was relying on Hall Quality Builder's excavation of the area to demarcate his property boundaries when he built his shed. The superior court noted that this finding of good faith on Henley's part was supported by Hurd's own testimony that even he was uncertain where the property line lay, and he therefore did not approach Henley to express concern about the location of the shed or the shop during their construction.

The superior court also determined Henley had met all the other requirements of adverse possession for this portion of the property. He had "openly and continuously used" the area "bordered on the south from Henley's well to a few feet past where [Henley's] shed was located" for at least ten years beginning in 2003 when he built the shed. The superior court described a number of Henley's activities in this area that, when taken together, constituted open and continuous use: building the shed, storing items inside and outside the shed, placing a picnic table alongside the shed, "repeatedly park[ing] his cars, boats and trailers," installing a carport, and "regularly put[ting] down new gravel." All of these facts together, according to the superior court,

were "synonymous with open and notorious conduct that was exclusive and hostile to Hurd and his predecessor's interest in the land."

In contrast, the superior court determined Henley did not satisfy the requirements of adverse possession for the entire area where his 2,300-foot shop was located. The superior court determined that Henley's "occasional use of this area to park vehicles" was not "sufficiently visible, open and hostile to put Hurd or his predecessor in title on notice that Henley was asserting a continuous adverse possessory interest." The superior court noted that the majority of the photo exhibits demonstrated "Henley mainly parked his vehicles and boat in the area near the shed," rather than in the southeastern corner of his property where the shop would eventually be located. The court noted that although Henley claimed he used part of this area for a garden, a fire pit, and a barbeque pit, no photographs documented the location of these activities.

The superior court awarded Henley the area where his shed used to stand as "roughly depicted" in a drawing by the court which was to be followed by a property survey. The court simultaneously found that Henley had not adversely possessed the larger area occupied by the shop and quieted title in favor of Hurd. The court determined Henley "was negligent in not having the land surveyed before he built his shop" and that the shop trespassed on Hurd's property, but awarded Hurd only nominal damages. Noting that Hurd had taken four years to notify Henley of the encroachment, the court gave Henley three years to move his shop.

## III. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Determining Henley Regularly Put Down Gravel And Repeatedly Parked Vehicles In The Disputed Area.

When concluding that Henley continuously and openly used the original shed area, the superior court noted that Henley "repeatedly parked his cars, boats and

trailers" and "regularly put down new gravel" in the area Henley adversely possessed. Hurd argues that, according to the record, these factual findings are plainly erroneous.

We review the superior court's factual findings for clear error. "It is the trial court's function, and not that of a reviewing court, to judge the credibility of witnesses and to weigh conflicting evidence."[1] Therefore, we will not disturb these findings of fact unless they were clearly erroneous.[2]

Hurd argues that from 2003 when Henley built the shed until 2012 when Henley built a gravel pad to serve as a foundation for his shop, the record demonstrated that Henley regularly graveled and parked only on "his own driveway," north of the southern property boundary, rather than in any part of the contested area. In support of his argument, Hurd points to testimony from Henley's longtime girlfriend, who said that Henley graveled the contested area only sometime after 2007. But at a different point, Henley's girlfriend testified that he brought in gravel to an area including the shed and south of the well during or before 2007. Hurd also highlights testimony from Henley that when he graveled the area in 2008 he was "still concentrating on the driveway in the front of [his] house." However, the superior court may have reasonably interpreted this to mean that while he concentrated on graveling his own driveway, he spread gravel to the area around the shed as well.

Regardless, the superior court had other testimony on which to rely for its findings of repeated graveling and parking in the contested area. Henley testified that,

---

[1]     *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980).

[2]     *Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 849 (Alaska 2018), *reh'g denied in part* (July 13, 2018) (quoting *HP Ltd. P'ship v. Kenai River Airpark, LLC*, 270 P.3d 719, 726 (Alaska 2012)).

between 2003 and 2012, he graveled five times and parked vehicles including cars and a boat in the area immediately adjacent to the shed.

Hurd points to a number of photo exhibits he believes demonstrate the gravel was not present and cars were not parked in the contested area throughout the statutory period. However, Henley testified that he had to gravel the area repeatedly because the gravel kept sinking down into the clay and being covered over by grass. And as cars are mobile by nature, photos showing vehicles parked north of the property line do not preclude their being parked south of the property line at other points during the same time frame. Moreover some of these photos do show Henley graveled and parked his boat on areas that appear to be south of the true property line. Others were taken after the shop foundation gravel pad was laid in 2012, and show the same extent of graveling in the area between the well and the shed that appears in earlier pictures.

Several photos Henley introduced at trial support the superior court's findings of fact. Photos taken before Henley installed the gravel pad in 2012 show gravel in areas south of the true boundary between Henley's and Hurd's properties: to the east of the shed, up to the door of the shed, and considerably south of Henley's well. Another photo, taken in 2003 or 2004, may show indications of graveling right up to the door of the shed. Other photos identified as taken before the gravel pad installation show a boat parked considerably south of Henley's well, by a distance estimated at over 15 feet. The boat appears parked approximately as far south in that picture before Henley laid the gravel pad as in a picture taken afterwards, casting doubt on Hurd's claim that the parking moved south across the property line only after Henley installed the gravel pad. While the photo exhibits alone do not clearly establish that Henley graveled and parked in the entirety of the adversely possessed area throughout the statutory period, they do support a finding that he did so in part of that area.

-8-                    7497

Hurd argues that since the court never determined precisely where Henley's shed was originally located, Henley could not have conclusively established that he graveled and parked in the area bordered by the shed. But many photo exhibits from numerous angles show where the shed stood in reference to key landmarks including Henley's well, Henley's shop and the gravel pad underneath it, and the southeast corner of Henley's garage, as well as where parking and graveling took place in relation to those landmarks. Multiple witnesses testified to and diagramed the original location of Henley's shed. The court had sufficient evidence from which to make a reasonable conclusion about where the shed originally stood and where the activities of parking and graveling took place in relation to that location.

At times, the testimony and pictures of the property provided admittedly conflicting and confusing evidence for the court to assess. However, faced with this difficult determination, the superior court reasonably judged the credibility of the witnesses and weighed conflicting evidence, appropriately determining the facts under the circumstances. Because testimony and photographs admitted into evidence supported the superior court's determination that Henley regularly graveled and repeatedly parked vehicles in the contested area, that factual finding was not clearly erroneous.

**B.     Henley's Activities On The Land Were Sufficient To Constitute Adverse Possession.**

Whether Henley's activities on disputed land were sufficient to constitute adverse possession presents issues of both law and fact.[3] We disturb a superior court's findings of fact underlying its conclusion only if they are clearly erroneous.[4] However,

---

[3]     *See id.*, (applying analogous standard of review for easements by prescription).

[4]     *Id.*

the application of law to these facts is a question of law we review de novo, using our independent judgment.[5]

To acquire title by adverse possession under AS 09.45.052(a), the claimant must prove possession of the land that was continuous for the statutory period, open and notorious, and exclusive and hostile to the true owner.[6] The statutory period for a claimant acting on the basis of a good-faith mistake that the disputed land lies within the boundaries of the claimant's own property is ten years.[7] An adverse possessor must meet each of these requirements by clear and convincing evidence.[8] "Continuity, notoriety, and exclusivity of use . . . are 'not susceptible to fixed standards,' but rather 'depend on the character of the land in question.' "[9] Exclusivity is not destroyed by occasional permissive use by the claimant's guests or even trespassers.[10] Hostility is not destroyed by a claimant's mistaken belief of holding title to the land, so long as the claimant's use of the land is without the record owner's consent.[11] The underlying purpose of these

---

[5]     *See id.*; *Glover v. Glover*, 92 P.3d 387, 391 (Alaska 2004) (discussing hostility).

[6]     *Prax v. Zalewski*, 400 P.3d 116, 120 (Alaska 2017).

[7]     AS 09.45.052(a).

[8]     *Curran v. Mount*, 657 P.2d 389, 391-92 (Alaska 1982).

[9]     *Vezey v. Green*, 35 P.3d 14, 20 (Alaska 2001) (quoting *Nome 2000 v. Fagerstrom*, 799 P.2d 304, 309 (Alaska 1990)).

[10]     *See Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 831 (Alaska 1974) ("[A] claimant's 'possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use.' " (quoting *Norgard v. Busher*, 349 P.2d 490, 496 (Or. 1960))).

[11]     *See id.* at 832 ("Peters believed his right to possession derived from his uncles, not from any acquiescence, consent or permission of the [record owners]." ).

requirements is "to put the record owner on notice of the existence of an adverse claimant."[12]

Even if individual actions may be insufficient to constitute possession when considered separately, in combination those actions may "demonstrate continuous and uninterrupted possession."[13] For instance, in *Alaska National Bank v. Linck*, we affirmed the trial court's determination that "clear[ing] part of the land, buil[ding] and maintain[ing] barricades, and ke[eping] the property clean" were sufficient to constitute continuous, hostile, and notorious possession.[14]

In finding that Henley continuously and openly used the adversely possessed area between a few feet south of Henley's well to where the shed stood, the superior court noted Henley built and frequently used the interior and exterior of the shed, had a picnic table alongside the shed, erected a carport near the shed, and "repeatedly parked his cars, boats and trailers" and "regularly put down new gravel" in that contested area. Hurd argues these activities are insufficient to constitute adverse possession.

In the most analogous case of ours cited by Hurd, *Tenala, Ltd. v. Fowler*, we concluded claimants' activities of building a shed and an addition to a cabin straddling the property boundary were sufficient to establish adverse possession for those

---

[12] *Id.* at 830.

[13] *Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052 (Alaska 1977).

[14] *Id.* at 1052-53 (footnotes omitted); *see also Peters*, 519 P.2d at 828-29, 832 (claimant's activities of living on contested land during seal hunting season, scraping seal hides, repairing boats there, digging clams, and planting garden sufficed to establish the elements of adverse possession).

areas where the structures slightly extended over the boundary.[15] But in the areas where the *Tenala* claimants' activities consisted only of using the adjoining portion of disputed land as an unimproved driveway to access the cabin and shed, park cars, and store garbage cans, these activities were insufficient to "give[] notice to the true owners that [they] were claiming a possessory interest" in that portion of land.[16] We explained that the *Tenala* claimants "never placed any permanent improvements on [that section] and never fenced or posted the area as their own."[17]

In contrast to the *Tenala* claimants, Henley used the land from south of his well to where his shed stood as if he owned it, rather than to pass through to gain access to another part of his property. His activities included making and maintaining improvements to the land. In addition to demarcating the land as his own by repeatedly laying down gravel, Henley built and conspicuously used a 12-by-16-foot shed that — in contrast to the merely slightly encroaching buildings in *Tenala* — stood entirely on Hurd's side of the true property line.[18] These activities were at least as extensive as the

---

[15]    921 P.2d 1114, 1118-19 (Alaska 1996). Hurd cites two other cases of ours which are not analogous. The first relates to extinguishment of easements by prescription, rather than adverse possession. *See Reeves v. Godspeed Props., LLC*, 426 P.3d 845, 854 (Alaska 2018), *reh'g denied in part* (July 13, 2018). The second establishes that a claimant, by merely excavating a foundation that straddled a property line and then vacating the property for years without maintaining that foundation, did not demonstrate sufficiently continuous possession of the land excavated. *Walsh v. Emerick*, 611 P.2d 28, 30-31 (Alaska 1980).

[16]    *Tenala, Ltd.*, 921 P.2d at 1118-20.

[17]    *Id.* at 1119.

[18]    *Id.* at 1118-19.

*Alaska National Bank* claimants', which sufficed to demonstrate continuous, hostile, and notorious possession.[19]

Cases from other jurisdictions provide support for our determination that Henley's actions, which included building and using his shed as well as laying down and maintaining his gravel driveway, were sufficient to notify Hurd of the hostile nature of Henley's possession. Connecticut claimants, by building and using a metal shed for storage on the true owner's property, demonstrated sufficiently exclusive use of that land to establish adverse possession.[20] Missouri claimants, through adverse possession, obtained an area where they put down gravel, mowed and raked the grass, and near which they built a garage only reachable through that gravel driveway; these activities sufficed to show actual, hostile, open and notorious, exclusive, and continuous possession even though the claimants allowed others, including the record owners, to use the driveway when necessary.[21]

Henley's activities on the land under and near the shed were sufficient to establish the requirements of adverse possession for the statutory period. Henley built and used his shed himself, and nothing in the record indicates that Hurd ever had access to the shed, let alone used the contested portion of land in any way. Henley's shed, even if built on skids, was a sufficiently permanent structure to meet the requirements of

---

[19]     *See Alaska Nat'l Bank v. Linck*, 559 P.2d 1049, 1052-53 (Alaska 1977) (noting claimants had "cleared part of the land, built and maintained barricades, and kept the property clean"); *see also White v. Lambert*, 332 S.E.2d 266, 268-69 (W. Va. 1985) (determining as sufficient to constitute adverse possession claimants' activities of using the property as their lawn, planting shrubs and trees, burying a waterline, and building a shed).

[20]     *Woycik v. Woycik*, 537 A.2d 541, 544 (Conn. App. 1988).

[21]     *Trokey v. R.D.P. Dev. Grp., L.L.C.*, 401 S.W.3d 516, 526-28 (Mo. App. 2013).

adverse possession because the presence of a shed is sufficient to provide notice to a landowner of exclusive and hostile possession.[22] Henley built and used his gravel driveway extending over the property line near the shed in a similar manner, to park cars, boats, and trailers in the area he used as his own over a long stretch of time. By erecting and using a shed as well as graveling and using a driveway on the contested area for ten years, Henley engaged in activities sufficiently open and notorious, exclusive and hostile, and continuous and uninterrupted to satisfy the elements of adverse possession.[23]

### C. The Superior Court Adequately Defined The Area Adversely Possessed By Henley.

Hurd argues both that the superior court erred by not describing the area it granted to Henley with sufficient precision and that Henley failed to meet his burden of providing a description of the land he claimed to have adversely possessed with sufficient particularity. However, Henley originally claimed to have adversely possessed a larger area (the entire area occupied by his shop) than the parcel the trial court eventually awarded him (the smaller area where his shed used to stand). For this reason we focus on the sufficiency of the superior court's description of the area granted to Henley.

---

[22] *See Woycik*, 537 A.2d at 544.

[23] *See Alaska Nat'l Bank*, 559 P.2d at 1052-53 (adverse possessors had "cleared part of the land, built and maintained barricades, and kept the property clean"); *see also Trokey*, 401 S.W.3d at 526-28.

Whether a trial court's description of adversely possessed land is sufficiently precise and definite is a question of law. Although we have not addressed what standard of review we apply to this issue in the adverse possession context, we generally review the sufficiency of superior court findings de novo.[24] Accordingly we apply our independent legal judgment and review de novo the adequacy of the superior court's description of the land awarded to Henley.[25]

The superior court described the area it awarded to Henley as the "portion of Hurd's property . . . bordered on the south from Henley's well to a few feet past where [Henley's] shed was located." This included "a small portion of the land north of the shed where the picnic table was located." The court provided the parties with a drawing to help them understand where the area adversely possessed by Henley was, "based upon the location of [the] southeast corner of Henley's garage." The superior court noted that although it had a survey of the encroachment as of 2016, it did not have a survey of Henley's property current as of the time of trial. Therefore, the court determined the land must be surveyed before a final determination was made.

Hurd argues that the superior court erred by describing the area adversely possessed by Henley with insufficient precision. In particular, Hurd contends the superior court's description is inadequate because it defines the area's boundaries using

---

[24]     *See Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) ("Whether there are sufficient findings for informed appellate review is a question of law." (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008))); *Alvarez v. Ketchikan Gateway Borough*, 28 P.3d 935, 938 (Alaska 2001) ("Whether . . . findings are sufficient to permit appellate review is a legal question that we decide by exercising our independent judgment.").

[25]     *See Inserra v. Violi*, 679 N.W.2d 230, 235 (Neb. 2004) (applying de novo review to the entirety of an adverse possession action, including sufficiency of description).

a now-invisible landmark: the original location of Henley's shed, which had been moved prior to trial.

Our only case considering how precisely a court need define an adversely possessed area is *Vezey v. Green*, in which we upheld a superior court's use of landmarks to delineate boundaries.[26] In *Vezey* the superior court described the adversely possessed area as a "rectangular" parcel defined by "a telephone line to the north, Shaw Creek to the east, Old Richardson Highway to the south, and a line 300 feet from the house to the west."[27] On appeal the original landowner argued the superior court's reliance on "natural boundaries" to define the property was without legal precedent.[28] We rejected this argument, determining the superior court's description of the adversely possessed area with reference to landmarks posed no "legal problem" because "[n]atural barriers . . . may serve as boundaries in adverse possession cases."[29]

*Vezey* thus confirms the superior court may use landmarks, rather than metes and bounds, to describe the boundaries of adversely possessed parcels. But *Vezey* leaves open whether the superior court may use the previous locations of landmarks later moved to delineate those boundaries. We therefore turn to other jurisdictions for guidance on this point.

The Wisconsin Supreme Court ruled that a trial court's property description, based on the location of a fence no longer standing, was insufficiently definite to support an adverse possession judgment; the court thus recommended a

---

[26] 35 P.3d 14, 24 (Alaska 2001).

[27] *Id.*

[28] *Id.*

[29] *Id.*

description by metes and bounds.[30]  However there is no indication the trial court in question had reference to photo exhibits showing the fence's previous location.[31]

Indiana courts find descriptions sufficient for quiet title actions when the complainant describes the premises such that a "sheriff, with the aid of a surveyor, can find the real estate and determine its boundaries."[32]  The Indiana Supreme Court determined one complainant's property description sufficient despite its reliance on a fence's previous location:  "[W]e think [the parcel described] could be found with the assistance of a competent surveyor, aided by one having knowledge of the former location of the fence referred to."[33]

In Illinois an adverse possession claimant must "establish with reasonable certainty the location of the boundaries of the tract" claimed under adverse possession.[34] Under this standard the Illinois Supreme Court reversed a decision granting title to claimants where the proposed boundary was defined by a fence long since removed and

---

[30]     *Brockman v. Brandenburg*, 221 N.W. 397, 398 (Wis. 1928) ("It seems to us that the strip should be described by metes and bounds, if there is to be a permanent settlement of the controversy.").

[31]     *See id.*

[32]     *Morgan v. White*, 56 N.E.3d 109, 117 (Ind. App. 2016) (quoting *Gilbert v. Lusk*, 106 N.E.2d 404, 410 (Ind. App. 1952) (en banc)).

[33]     *Brown v. Anderson*, 90 Ind. 93, 95 (Ind. 1883) (considering sufficiency of claimant's property description rather than trial court's property description).

[34]     *Schwartz v. Piper*, 122 N.E.2d 535, 538 (Ill. 1954); *see also Brosie v. Borrowman*, 332 N.E.2d 129, 130 (Ill. App. 1975) ("The boundaries of the parcel awarded to plaintiff are susceptible of specific and definite location with reasonable certainty . . . [which] is sufficient.").

the only evidence of the fence's prior location was testimony that was "vague, indefinite and conflicting."[35]

The superior court here relied on 6 days of testimony and 125 exhibits — mostly of photographs of the land — to establish the original location of Henley's shed and the other boundaries. Many photo exhibits from numerous angles show where the shed stood in reference to key landmarks including Henley's well, Henley's shop and the gravel pad underneath it, as well as the southeast corner of Henley's garage, which served as the basis for the court's drawing and all of which still stood at the time of trial. The superior court drew its guiding diagram on a survey of the encroachment on which the surveyors had clearly marked the location of Henley's well, and multiple witnesses had drawn the original location of Henley's shed on that same survey. The original location of the shed was therefore ascertainable with reasonable certainty from evidence in the record.[36]

The superior court's task in an adverse possession case is to clarify boundaries, not create further confusion. Yet adverse possession claims resulting from a good-faith but mistaken belief are often confusing by their very nature. And a statutory period of ten years means the trial court will often be charged with mapping activities long since completed and structures that may have changed over time. Hurd asserts the superior court here had no adequate means to determine the location of the area Henley adversely possessed. But Henley provided significant supporting documentation, including many photographs of the relevant landmarks. Given the challenging task

---

[35]    *Schwartz*, 122 N.E.2d at 539-40 ("[W]here the location of a boundary is marked by a monument at the inception . . . of the period of adverse possession, but such monument is lost or destroyed, the location of such boundary or the monument marking the same must be susceptible of definite proof in any action . . . of adverse possession.").

[36]    *See id.*; *Brosie*, 332 N.E.2d at 130.

before it, the superior court did not err by describing the area adversely possessed with reference to landmarks which are still standing and a landmark whose location is readily ascertainable with reasonable certainty from the record.

## D. The Superior Court Could Reasonably Conclude That Henley Acted In Good Faith.

Alaska Statute 09.45.052(a) requires that to gain title under adverse possession, a claimant must have engaged in possessory activities "because of a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant." Hurd contends the superior court erred by determining Henley had acted with a good-faith belief that the contested property was his.

Whether Henley acted in "good faith" under the meaning of AS 09.45.052 involves questions of both law and fact. "[T]he interpretation of . . . controlling statutes . . . is a legal question which we review de novo."[37] However, the superior court's determination that Henley acted in "good faith" is a finding of fact which we review for clear error because we interpret AS 09.45.052 to require only subjective good faith, without a showing of objective reasonableness.[38]

---

[37] *Moody v. Royal Wolf Lodge*, 339 P.3d 636, 638 (Alaska 2014).

[38] *See Enders v. Parker*, 125 P.3d 1027, 1029-31 (Alaska 2005) (stating "[t]he good faith inquiry requires a factual determination of intent that we review for clear error" when analyzing "good faith" in the context of will contests); *Air Logistics of Alaska, Inc. v. Throop*, 181 P.3d 1084, 1097 n.57 (Alaska 2008) ("[T]he determination regarding subjective good faith is generally factual and reviewed for clear error [while] the determination regarding objective reasonableness 'involves applying the proper interpretation of the [federal statute] and supporting regulations to uncontested facts, a primarily legal determination,' which should be reviewed de novo." (quoting *Bratt v. Cty of L.A.*, 912 F.2d 1066, 1072 (9th Cir. 1990))).

### 1. Alaska Statute 09.45.052(a) requires only subjective good faith.

Adverse possession in Alaska is primarily governed by AS 09.45.052, which sets forth the substantive elements a claimant must prove to acquire title by adverse possession, while AS 09.10.030 limits when a person may bring related actions to recover real property.[39] As amended in 2003, AS 09.45.052(a) limits the availability of gaining title through adverse possession to two types of claimants: adverse claimants who acted "under color and claim of title" and adverse claimants who acted "because of a good faith but mistaken belief that the real property lies within the boundaries of adjacent real property owned by the adverse claimant."[40]

Our previous cases do not address whether AS 09.45.052(a)'s prescription of a "good faith but mistaken belief" requires that this belief be objectively reasonable. This case thus presents a question of first impression: whether AS 09.45.052(a)'s good-faith provision requires that the claimant's belief of ownership be reasonably held as well as sincerely held. We conclude that it does not.

The legislature's 2003 amendments to Alaska's statutory scheme of adverse possession — previously contained in both AS 09.45.052 and AS 09.10.030 — were intended "to eliminate bad faith adverse possession claims."[41] Specifically, the legislature "modified AS 09.10.030 with the intent of abolishing adverse possession in cases where the claimant does not have color of title."[42] But instead of entirely eliminating adverse possession claims by individuals without color of title, "the

---

[39] *See Cowan v. Yeisley*, 255 P.3d 966, 972 (Alaska 2011).

[40] *Id.* at 972-73 (quoting AS 09.45.052(a), *as amended by* ch. 147, § 3, SLA 2003).

[41] *Prax v. Zalewski*, 400 P.3d 116, 119 (Alaska 2017).

[42] *Cowan*, 255 P.3d at 973 (footnote omitted).

legislature relocated the doctrine (with some alterations) to AS 09.45.052."[43] These alterations permitted adverse possession claims for claimants without color of title only when the claimant engages in "uninterrupted adverse notorious possession of real property for 10 years or more because of *a good faith but mistaken belief* that the real property lies within the boundaries of adjacent real property owned by the adverse claimant."[44] Together, these modifications "limit Alaskans' adverse possession claims to cases where the claimant had either color of title or *a good faith but mistaken belief* that the claimant owned the land in question."[45]

Legislative history demonstrates clear legislative intent to eliminate adverse possession claims by trespassers in "bad faith," or "squatters."[46] But the bill's drafters

---

[43]    *Prax*, 400 P.3d at 120.

[44]    *Cowan*, 255 P.3d at 972-73 (emphasis added) (quoting AS 09.45.052(a), *as amended by* ch. 147, § 3, SLA 2003).

[45]    *Id.* at 973 (emphasis added); *see also Hansen v. Davis*, 220 P.3d 911, 916 n.7 (Alaska 2009) ("To prevail under the amended adverse possession law, claimants must now show that they believed in good faith that the disputed land lies within the boundaries of their property. . . .").

[46]    Jennie Morawetz, Note, *No Room for Squatters: Alaska's Adverse Possession Law*, 28 ALASKA L. REV. 341, 359-69 (2011); Minutes, H. Judiciary Standing Comm. Hearing on S.B. 93, 23rd Leg., 1st Sess. (May 18, 2003) (testimony of Senator Wagoner) (stating that the proposed bill "would not . . . abolish all aspects of adverse possession; instead, its purpose is to eliminate the possibility that a landowner will lose property to a squatter who has no claim to the property"); Senator Thomas Wagoner, S. Judiciary Comm., S.B. 93 Sponsor Statement, 23rd Leg., 1st Sess. (2003), http://www.akrepublicans.org/wagoner/23/spst/wago_sb093.php ("[The amendments] would repeal the Doctrine of Adverse Possession in the case of 'bad faith' trespassers, giving private property owner's [sic] security in knowing their property cannot be taken by squatters.").

made no statements explicitly characterizing the "good faith" requirement as either objectively reasonable or subjectively held.[47]

Legislative committee minutes suggest an intent to preserve adverse possession claims by individuals who believe they know their properties' boundaries and inadvertently encroach upon their neighbors' properties. In committee, the bill's sponsor deferred questions about the proposed bill's effect to Jon Tillinghast, legal counsel to the corporation that had drafted the bill.[48] Tillinghast told legislators that adverse possession in "bad faith" occurs when one "moves onto a piece of property and builds a squatter's cabin," whereas adverse possession in "good faith" occurs when one "with a deed for a piece of property [who] thinks he knows the boundaries . . . ends up *inadvertently* using the adjacent property."[49] As an example of a simple good-faith boundary dispute, Tillinghast offered a hypothetical landowner with "a fence that was one foot on his neighbor's property" for 11 years; he explained that the landowner could successfully gain title over the strip of land, but only if the trespass were unintentional.[50]

The drafter's word choices provide no explicit guidance, as the terms "inadvertently" and "unintentional" are legally imprecise with respect to the

---

[47] *See generally* S.B. 93 Legislative History, http://www.akleg.gov/basis/Bill/Detail/23?Root=SB%20%2093.

[48] *See* Minutes, S. Judiciary Standing Comm. Hearing on S.B. 93, 23rd Leg., 1st Sess. at 9 (Apr. 16, 2003) (testimony of Senator Wagoner) (stating "Sealaska Corporation asked him to introduce this bill"); *see also id.* at 10 (testimony of Jon Tillinghast) (stating that Sealaska drafted the proposed bill).

[49] *Id.* at 10 (emphasis added) (testimony of Jon Tillinghast).

[50] Minutes, S. Judiciary Standing Comm. Hearing on S.B. 93, 23rd Leg., 1st Sess. at 13 (Apr. 30, 2003) (emphasis added) (testimony of Jon Tillinghast).

reasonableness of a belief.[51]  And the bill's legislative history demonstrates the drafters and legislators did not answer all of the complex legal questions that were likely to arise.[52]  Even so, the drafter's language describing the good-faith neighbor — one who made an unintentional, inadvertent trespass because he believes the land is his, even without color of title[53] — supports an interpretation that "good-faith" in this context is subjective.

Our previous cases interpreting similar statutory requirements also support reading AS 09.45.052(a)'s requirement of "a good-faith but mistaken belief" to require a subjectively held, rather than an objectively reasonable, belief.  We have never explicitly characterized this formulation as objective or subjective, but our reasoning has previously equated the phrase with a subjective belief, as has reasoning from the court of appeals.

In *Sheldon v. City of Ambler* we equated a "good faith mistake" with a subjective standard in the context of qualified immunity.[54]  We explained that "[b]ecause

---

[51]  *See, e.g.*, *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1221 (Fed. Cir. 1995) ("The boundary between unintentional and culpable acts is not always bright, for the facts often include subjective as well as objective elements." (citations omitted)).

[52]  In fact, even the misplaced fence hypothetical scenario described above was subject to some confusion.  *See* Minutes, S. Judiciary Standing Comm. Hearing on S.B. 93, 23rd Leg., 1st Sess. at 13 (Apr. 30, 2003) (testimony of Jon Tillinghast) (explaining he had initially "misadvised" the committee that the fence example was adverse possession under color of title when the example would actually qualify as good faith).

[53]  The pre-2003 statutory scheme already benefitted those adverse possessors with a certain type of objective good faith; those who possess the land under "color of title" were permitted to file a claim after possessing the land for only seven years.  *See* *Prax v. Zalewski*, 400 P.3d 116, 119 (Alaska 2017).

[54]  178 P.3d 459, 465 (Alaska 2008) (quoting *Samaniego v. City of Kodiak*,
(continued...)

objective reasonableness is required, officers do not enjoy immunity on account of their *subjective* good faith alone."[55]  And we clarified that "[a] police officer might make a *good faith mistake in believing* that his action is legal; this does not, however, prevent that same belief from being *unreasonable* for that officer to hold."[56]  Our analysis therefore reflected an understanding that a "good faith mistake" refers to a subjective belief, which in turn can be either objectively reasonable or objectively unreasonable.

Similarly, in *Mount Juneau Enterprises, Inc. v. City & Borough of Juneau*, we used the phrase "good-faith but mistaken belief" to mean a subjective belief.[57]  The case involved an "inverse condemnation," defined as "when a governmental entity takes private property for public purposes under the *good-faith but mistaken belief* that the taking does not require the exercise of eminent domain."[58]  A simple title search would have revealed the City's reliance on an easement was mistaken by showing that the entity that granted the City an easement lacked authority to do so.  But we held "the City's reliance on [the] easement" was nevertheless consistent "with a good-faith but mistaken belief that there was no need to exercise eminent domain powers."[59]

---

[54]    (...continued)
2 P.3d 78, 84 (Alaska 2000)).

[55]    *Id.* (alteration in original) (emphasis added).

[56]    *Id.* (emphases added).

[57]    923 P.2d 768, 773 (Alaska 1996).

[58]    *Id.* (emphasis added) (citing *State of Alaska, Dep't of Highways v. Crosby*, 410 P.2d 724, 728-29 (Alaska 1966)).

[59]    *Id.*  Although we could have emphasized that the City's belief was objectively reasonable, in addition to being subjectively held, we did not.  We instead simply rejected the appellant's argument that the City was required to conduct a title
(continued...)

In *Wahl v. State* the court of appeals implicitly equated "a defendant's *subjective* belief in the existence of a sentencing agreement" with "a defendant's reliance on *a mistaken but good faith belief* that a sentencing agreement has been made . . . even if the mistaken belief is unilateral."[60]

In each of these cases, we or the court of appeals used terminology similar to the language at issue from AS 09.45.052(a) — "a good faith but mistaken belief" — and implicitly characterized it as a subjective standard. Furthermore, neither the statutory text nor the legislative history indicates that the phrase specifically requires an objective standard of good faith. Therefore we construe "a good faith but mistaken belief" in AS 09.45.052(a) to require only subjective good faith.

### 2. The superior court did not err in determining Henley acted in subjective good faith.

An adverse possessor must demonstrate by clear and convincing evidence that statutory requirements are met, including the requirement that the possessor act under a good-faith belief that the disputed land was within the possessor's property boundaries.[61]

The superior court found that Henley did possess a good-faith belief that the contested area was part of his property. The superior court reasoned that Henley's reliance on Hall Quality Builders' excavation led him to this belief, noting Henley's testimony that he relied on the excavation performed by Hall Quality Builders when determining what he thought his property boundaries were. The superior court also

---

[59]     (...continued)
search to verify that the entity granting the easement held the land rights the City sincerely believed the entity held. *Id.*

[60]     691 P.2d 1048, 1052 (Alaska App. 1984).

[61]     *Curran v. Mount,* 657 P.2d 389, 391-92 (Alaska 1982).

pointed to Hurd's testimony admitting he had been unsure enough of the precise boundary to not bring his concern up to Henley, even after Hurd attempted his own informal survey with the aid of a compass, hundred-foot tape, metal detector, and friend who conducted surveys professionally.

Hurd argues the superior court erred in concluding Henley had a good-faith belief that the contested property belonged to him. Hurd first points to a conversation during which, after Henley had built his shed, Henley told Hurd that they should get a survey done so that they could build a privacy fence.

When Henley suggested performing a property survey before building a fence that would precisely demarcate the boundary between his and Hurd's property, Henley did reveal he was uncertain exactly where the boundary lay between the two properties. However, his admission of uncertainty as to the precise boundary does not negate the sincerity of his belief that the area on which he had already built his shed was on his side of that boundary.

Hurd next suggests Henley's inconsistent testimony on whether and where he found property markers contradicts the superior court's finding that Henley built his shed on Hurd's land because of a good-faith belief the land was his. Henley testified at trial that when he received the property in 2001, before he built his shed, he found a white stake near the southeast corner of his property; this testimony clearly contradicted what Henley had said in the deposition, as the superior court pointed out in its findings of fact.

Hurd's argument finally relies on Henley's own testimony, which indicates Henley knew there was a possibility he was encroaching on his neighbor's property by building the shed. Henley testified about his state of mind when constructing the shed: "I thought I was on my land. So if I was off, I figured it wasn't [by] very much."

Henley explained: "[I]f there is a problem, I can move [the shed] because it's on skids . . . I could have just put a strap around it and just tugged it forward a couple feet."

But "[i]t is the trial court's function, and not that of a reviewing court, to judge the credibility of the witnesses and to weigh conflicting evidence. This is especially true where the trial court's decision depends largely upon oral testimony."[62] The superior court acknowledged that Henley's testimony about the stakes was inconsistent but still determined, in reliance on other portions of Henley's oral testimony, that Henley believed when he built his shed that the land underneath was his in reliance on Hall Quality Builders' excavation of that area.

We conclude that AS 09.45.052(a)'s requirement of good faith requires only subjective good faith; the adverse claimant's belief of possessing land need only be sincerely rather than reasonably held. As a result, the record contains sufficient evidence to support the trial court's determination that Henley had a good-faith but mistaken belief that the "contested area" was part of his property.

IV.    CONCLUSION

We therefore AFFIRM the superior court's judgment.

---

[62]    *Kessler v. Kessler*, 827 P.2d 1119, 1119 (Alaska 1992) (quoting *Penn v. Ivey*, 615 P.2d 1, 3 (Alaska 1980)).